## BROCALSA CHEMICAL CO. et al. v. LANGSENKAMP et al.

Circuit Court of Appeals, Sixth Circuit. April 10, 1929.

On Motion for Rehearing, June 5, 1929.

No. 5070.

E. E. Corn, of Ironton, Ohio, and Joseph McGhee, of Columbus, Ohio, for appellants.

Frederick E. Matson, of Indianapolis, Ind. (Hedges, Hoover & Tingley, of Columbus, Ohio, Matson, Carter, Ross & McCord, of Indianapolis, Ind., Herman Tingley, of Columbus, Ohio, and Solon J. Carter and Austin V. Clifford, both of Indianapolis, Ind., on the brief), for appellees.

Before DENISON, MOORMAN, and HICKS, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). ■ The subject of fraudulent misleading may be summarily disposed of. There is no allegation of any misstatement as to the value of the bonds, or, indeed, any pleading claim that they were not worth the price paid. There is no substan-

tial proof of any plan or representation that the proceeds of the bonds were not to be used for all ordinary corporate purposes, naturally including the refunding in a long-time form of debts which were due or currently to become due—indeed, on their face the bonds were refunding bonds. It would not normally be very important to the company whether this $50,000 was put at once into the corporate operations, leaving Tomlinson's debt maturing in a short time, or was used to retire Tomlinson's debt, correspondingly increasing the company's credit; but, even if this were material, the record is entirely barren of any proof of misleading. In this respect the trial court was plainly right.

As to the other feature, we are convinced both that the Indiana law was not intended to apply to such a transaction as this, even if the sale occurred in Indiana, and also that the sale must be treated as having occurred in Ohio, and therefore as not being subject to the Indiana law. We pass by without consideration the point made that the Indiana law and others of that class are not intended to, even if they seem to, apply to a transaction by which additional corporate securities are absorbed by existing stockholders. The first blue sky laws were thought by some of the District Courts to be unconstitutional, as unduly restricting liberty of contract. Alabama & N. O. Transp. Co. v. Doyle (D. C.) 210 F. 173; Compton Co. v. Allen (D. C.) 216 F. 537; Bracey v. Darst (D. C.) 218 F. 482—all in effect overruled in Blue Sky Cases, 242 U. S. 539, 37 S. Ct. 217, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643; 242 U. S. 559, 37 S. Ct. 224, 61 L. Ed. 493; 242 U. S. 568, 37 S. Ct. 227, 61 L. Ed. 498. The Supreme Court reached the contrary conclusion in reliance upon the theory that the laws there involved bore some reasonable relation to the subject of preventing fraud in the sale of corporate securities. From a reading of the Supreme Court opinions, it is evident that, if the law application there challenged had been to a sale by a corporation to a large and active stockholder, of a security which he, by his representatives, had duly authorized, quite another conclusion might have been reached.[3]

However, for the purpose of this opinion, we assume that the Indiana law is rightly applicable to sales from a corporation to its existing stockholders. That law (Act July 26, 1920 [Acts Sp. Sess. c. 26]) after the various prohibitions which it may be assumed

would by their generality forbid such a bond sale as this, if occurring in Indiana, proceeded by section 11, to say: "The provisions of this act shall not apply: (1) To one who, in a trust capacity * * * or by judicial authority," etc. (2) "To pledge to sell in the ordinary course of business, a security pledged to [one] as security for debt in good faith and not for the purpose of avoiding the provisions of this act." (3) To the disposal in good faith of the corporation's own securities at an expense and under conditions carefully specified and not here applicable.

We are concerned with subdivision (2). Its precise language as quoted is literally unintelligible, and we find no Indiana court construction, but we think we may be reasonably certain of the intent, and that it can rightly be construed according to that intent. To be effective along that line, it must mean that, when corporate bonds have been duly authorized and issued, the statutory prohibitions do not apply to the pledge of such bonds as collateral security for a valid corporate debt, when the pledge is made in good faith, and not to avoid the operation of the act, and that bonds so pledged may be sold by the pledgee in the ordinary course of business, when also the sale is in good faith, and not to avoid the act. Neither from the suggestions of counsel, nor from observation of the language, have we been able to get any other interpretation.[4] It is not questioned that the $50,000 of bonds had been pledged with Tomlinson in November, 1923, as collateral security for a $50,000 loan then made, and there is no reason to think that such pledge was not in good faith or was made with any purpose of avoiding this act. The company had no equity in these 50 bonds. As to the $4,000, the plain inference is, from the testimony of Lauritzen and Wambaugh, that the $7,000 of bonds which McNamara had with him in Indianapolis had been pledged by the company to Wambaugh as collateral for a $10,000 loan by him, and had been by him intrusted to McNamara for sale, and that to him McNamara accounted for and paid over the entire proceeds; the company having no equity in these bonds. There is no proof that this pledge had not been made in good faith or with intent to avoid. We see no opportunity to indulge in any such inference.

Upon this record both the $50,000 sale

---

[3] Upon grounds of—e. g.—estoppel.

[4] This interpretation is confirmed by fact that the Legislature amended the law so as clearly to give it this effect. See section 5010, Burns' Ann. Stats. 1926.

and the $4,000 sale by or for the pledge should be considered as made "in the ordinary course of business." This statutory phrase should not be restricted to a sale in the nature of a foreclosure, made by the pledgee without the co-operation of the pledgor. It is at least as ordinary a course of business, after a temporary loan has been obtained upon the pledge of securities, for the pledgor to co-operate with the pledgee in finding a purchaser who will take over the securities permanently; nor is it outside the usual course of business for the pledgor to offer additional and sufficient inducement to one who will permanently make this refunding loan.

It follows that the Indiana statute does not purport to invalidate the $4,000 sale, which occurred in Indiana as stated, nor the $50,000 sale, even if that might be considered as an Indiana transaction. In neither case did the company get a dollar as the proceeds of the sale of these bonds; the pledgees took all.

As to this $50,000 sale, what happened in Indiana must be deemed negotiations, leading to a conditional offer made in Ohio to a resident of Ohio, and which offer was accepted in Ohio. The question involved is not whether the negotiators, by what they did in Indiana, violated a law of that state; it is whether a sale, otherwise valid, was made void or voidable by the express declaration of the Indiana statute that all transactions in which the law is not followed shall be void. It is fundamental that such a statute can have no extraterritorial effect (Hilton v. Guyot, 159 U. S. 113, 163, 16 S. Ct. 139, 40 L. Ed. 95), and that the validity of the contract is determined by the law of that state where occurred the last act necessary to make the contract complete (Restatement Conflict of Laws, §§ 333, 353). When McNamara left Indiana with the signed notes and with the separate collateral, it is clear that the only contract of binding force was, at the most, that Langsenkamp would buy if McNamara could find a purchaser who would be satisfied to take the notes with the collateral and furnish the money, and that McNamara would use reasonable efforts to find such a purchaser and would be entitled to reasonable time therefor. It is equally clear that no bonds were at that time appropriated to the purchase; that neither Langsenkamp nor McNamara knew which the bonds would be, nor where they could be found, to which the transaction would finally apply; that Langsenkamp was at liberty to withdraw from the deal at any time before a pur-

chaser for his notes should be found, at least after allowing a reasonable time therefor; and that McNamara also was at liberty to withdraw and return the papers and have the matter ended, at least after exhausting reasonable efforts to find a purchaser.

Taking it altogether, this amounted to an offer by Langsenkamp that he would buy if McNamara could and would meet the condition imposed. There could be no sale until the condition was met. It was not met until, after substantial and unsuccessful efforts, McNamara found Tomlinson, who, at his home in Ohio, agreed to accept the notes and furnish the bonds, and thus, for the first time, the offer became irrevocable. It is true that the minds of the parties might meet upon and make complete a contract in Indiana, even though its taking effect might be made to depend upon a condition subsequently to be performed in Ohio, upon the failure of which condition the contract would fail, and we may assume that to such a contract the invalidating law of Indiana would apply; but there could not be such a complete contract when the happening of the future condition depended upon the will, or the contingently successful efforts, of one of the parties. In that situation there is no room for anything more than an offer, awaiting acceptance.

Appellants argue that Langsenkamp made McNamara his agent to negotiate these notes and find bonds which could be bought, and then buy them, all on Langsenkamp's behalf, and that thus these acts were done in Ohio by Langsenkamp, through his agent. If McNamara's testimony were to be accepted as proof in the case (as we think it should be), it seems to be difficult to deny this pro tanto agency. However, we do not rest our conclusion upon that ground, but, for the purposes of the opinion, assume that McNamara was all the time the agent of the company and the underwriting broker in trying to sell these bonds, and that it was these proposed vendor principals upon whom fell the burden of meeting the conditions which Langsenkamp told these vendors they must meet before he could buy. This view makes immaterial the question of any agency for Langsenkamp by McNamara.

To establish the applicability of the Indiana law to such a transaction, appellee cites several cases, which upon inspection plainly appear to depend upon distinctly different facts. Only two of these seem close enough to justify comment. In Rhines v. Skinner Co., 108 Neb. 105, 187 N. W. 874, stock in a Nebraska corporation had been

sold in violation of the Missouri Blue Sky Law [1] (if applicable) to a purchaser across the state line in Missouri. It was argued that the sale, although negotiated in Missouri, had not been closed until the seller in Nebraska accepted buyer's note, offered in payment for the stock, and therefore the Missouri law could not apply. The Nebraska court held that the Missouri law did apply; but, even if the decision were to be accepted as otherwise sound, the court is careful to show dependence upon the fact that the last act which completed the contract was not the acceptance of the note in Nebraska, but the later acceptance by the vendee in Missouri of the stock certificate which the Nebraska vendor tendered in performance.

In Chattanooga Nat. Bldg. & Loan Ass'n v. Denson, 189 U. S. 408, 23 S. Ct. 630, 47 L. Ed. 870, the plaintiff, a Tennessee building and loan association, had solicited business through agents in Alabama. Negotiations with Denson for a loan having been completed in Alabama, his application papers were sent to plaintiff in Tennessee for acceptance or rejection. They were accepted and a prepared note and mortgage, with draft for the amount, were mailed to the Alabama agent, who there had the note and mortgage signed, paid the money to Denson, and recorded the mortgage. The question was whether the plaintiff had been "doing business" in Alabama, and the Supreme Court answered, "Yes." Manifestly, the question was not dependent on the territorial situs of this specific contract, as between the parties, as if the rate of statutory interest or some such thing had been involved. The Supreme Court was careful to say: "Counsel has discussed at some length the situs of contracts, and by the law of what place their obligation is determined. We think, however, that the discussion is not relevant."

█ Counsel argue here, as in the court below, questions of the admissibility of evidence, depending upon the Ohio statute, which determines the competency of parties to testify in a case where the adverse party to the transaction has died. Such state statutes very commonly go on the theory that the surviving party may not testify as to those particular matters which were within the knowledge of the deceased, so that the surviving party may not make statements which the deceased party, if living, could have contradicted. They also commonly disqualify an agent of the surviving party, as to dealings between that agent and the deceased. If this was the purpose of the Ohio statute (Gen. Code Ohio, §§ 11493–11495),

as has been said (Wolf v. Powner, 30 Ohio St. 472, 477), it was unhappily expressed. Section 11493 strikes out the common-law disability, and in effect declares that all credible persons, irrespective of their interest in the event, are competent witnesses. Section 11494 declares exceptions to this rule, dependent upon privilege, assignment, etc. Section 11495 initially restores the full common-law incompetency of a party in certain specified instances, one of which is, "when the adverse party is * * * an executor or administrator," and then makes exceptions to this incompetency. The net result literally is that the incompetency affects only the party adverse to the administrator, and not the officers, agents, or representatives of that party; while, on the other hand, the party may not testify, even about a subject-matter concerning which the deceased knew nothing and could not have spoken, if living.

The Supreme Court of Ohio has frankly accepted these seeming incongruities, and, in rationalization of the unqualified prohibition against testimony by parties adverse to an administrator, it has declared that this means only persons with actual adverse interests and not merely those who are nominally and only nominally parties of record. Baker v. Kellogg, 29 Ohio St. 663; Wolf v. Powner, supra, at page 476 of 30 Ohio St. In the Baker Case, B, one of the two signers to the note and defendants to an action thereon prosecuted by the payee's executor, was making no defense and was permitting judgment to go against him. The other defendant, A, did defend, but B was allowed to testify, because he had no real interest in the particular phase of the case that was in dispute. This ruling (dependent on the "reason and spirit" clause, concluding section 11495) remains unmodified by any later case, and covers the situation of McNamara in this case as to the $50,000, and also, it would seem, as to the $4,000. McNamara is made defendant, but as to the $50,000 no relief of any kind is asked against him, nor are facts set out which indicate his personal liability. He cannot be made incompetent as a witness by including him as a party, unnecessarily and without good grounds stated. As to the $4,000, the prayer is that "the defendants" repay this sum to plaintiff; and McNamara is included in the list of nominal defendants. However, there is no specific prayer against him; the bill shows that, in this matter, he was acting as agent for the Brocalsa Company or the underwriter, and no facts are stated implying personal liability. Under the rule of the Ohio cases, we greatly doubt whether Mc-

[1] Rev. St. 1919, §§ 11919–11932.

Namara is incompetent, even as to the $4,-000; but that is not necessary to be decided. [7] Holmes was president of the Brocalsa Company, a corporate defendant, and Lauritzen was president of the "Foundation, Inc.," a corporate defendant, the underwriting broker. Some testimony of each was excluded. In Cockley Milling Co. v. Bunn, 75 Ohio St. 270, 79 N. E. 478, 9 Ann. Cas. 179, 116 Am. St. Rep. 741 (1907, Summers, J.), it was held that the statutory disqualification did not extend to the general manager of a corporate party. The reasoning clearly covers all the officers and agents of the corporation. It notes that these officers and agents, at least if stockholders, might have been excluded under the common law, because of their interest in the subject-matter, but that the statute has abolished this exclusion and made existence as a party to the record, and not interest, the disqualifying thing. The reasons which make it inadvisable that the corporate agent should testify when the adverse party is dead and cannot, are recognized as forceful; but it is said that for the court to make over the statute to fit the needs or proprieties of the situation would be judicial legislation. This case has never been overruled or modified. It is later than some lower court decisions indicating the other view, and necessarily overrules them. It has been in effect affirmed and applied in Powell v. Powell, 78 Ohio St. 331, 339, 85 N. E. 541; Loney v. Walkey, 102 Ohio St. 18, 25, 130 N. E. 158. The offered testimony of Holmes and Lauritzen was competent.

When the testimony of each of these three witnesses was excluded, proferts were made to a considerable extent as to what the witness would say if allowed to testify. Testimony thus proffered, being oral testimony, which in theory, if admitted, might have been modified by cross-examination, or disputed, cannot be considered by an appellate court without embarrassment. Sometimes the only remedy would be to send the case back for further trial under other rules of evidence, as in a case at law, and if there were in this case real reason to think that the plaintiff had lost substantial rights of cross-examination or of dispute, we might be compelled so to remand the case; but we reject that course, because the appellee urges us, if we think the evidence was improperly rejected, to consider and decide the case de novo, upon the present record, thus implying that the subject-matter of the rejected evidence was not important, and because, so far as we may infer from the course of the trial or the argument, the facts which thus appear, and which are material to the result reached, are undisputed, and there has been and is no desire by appellee to dispute them.

Accordingly the decree below is reversed, and the case remanded, with instructions to dismiss the bill. If counsel think that we have drawn too strong inferences as to what facts are conceded, and that our conclusions upon the question of evidence fairly require any further hearing in the court below, we will, within the time provided for rehearing, entertain an application to modify the mandate in this respect.

### On Motion for Rehearing, etc.

The application to rehear is denied. To clarify the subject-matter mentioned therein, we may add that, as to the locus, the vital matter is where the sale was made. It might be conceded that there was in Indiana a completed contract for a sale, to be closed if and when, etc., which contract would have been valid except as invalidated by the statute, and yet the locus of the sale itself would be in Ohio, where the condition was met and the property was selected and delivered. The Indiana transaction cannot have controlling analogy to a "sale or return," because, if for no other reason, the property was then neither identified nor turned over.

As to whether the sale was by the pledgee: Tomlinson simultaneously gave up the note of the company and its collateral pledge of these bonds and accepted in their stead plaintiff's note and his collateral pledge of these same bonds and other securities. To assume that these bonds were released by Tomlinson to the company and sold by the company to Langsenkamp, and by him again pledged to Tomlinson, is to state successive steps which the law for some purposes would imply, but is to overlook the substance of this actual transaction. Any participation by the company in this sale, which might be implied in spite of its nonexistent equity in the bonds, ought not to embarrass the good-faith pledgee in getting the full benefit of the exemption which the law gave him.

Pursuant to the suggestion in the opinion, plaintiff applies to have the mandate modified, so as to remand for further proofs. Her counsel point out no particular in which it is claimed that the real facts are not correctly assumed in the opinion. These facts not only appear by McNamara's testimony, a portion of which was only offered, and was not received, but they are the natural, if not the inevitable, inferences from the unquestioned situation. That Langsenkamp should have supposed that his note was finally ac-

cepted, and that he was bound by it, regardless of whether it could be discounted to raise money to redeem some outstanding bonds, is so improbable that the loss of the right to cross-examine McNamara on that subject seems the harmless loss of a barren right.

There being no other claim of prejudice from our assumption of facts, the motion to modify is also denied.