**Louis S. SINGER and Mollie Singer,
Plaintiffs below, Appellants,**

v.

**The MAGNAVOX COMPANY et al.,
Defendants below, Appellees.**

Supreme Court of Delaware.

Submitted March 14, 1977.

Decided Sept. 23, 1977.

Steven J. Rothschild and David B. Ripsom, of Prickett, Ward, Burt & Sanders, Wilmington, and Stuart H. Savett, of Kohn, Savett, Marion & Graf, P. C., Philadelphia, Pa., of counsel, for plaintiffs-appellants.

David A. Drexler and William C. Anderson, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants-appellees.

Before HERRMANN, C. J., DUFFY and McNEILLY, JJ.

DUFFY, Justice (for the majority):

In this action attacking a statutory corporate merger, plaintiffs appeal from an order of the Court of Chancery granting defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted. Del.Ch., 367 A.2d 1349 (1976).

## I

The litigation centers on a merger in July 1975 of The Magnavox Company (Magnavox) with T.M.C. Development Corporation (T.M.C.). Plaintiffs owned common stock of Magnavox at the time of the merger and they bring this class action for all persons who held such shares on the day before the merger. Defendants are: Magnavox, North American Philips Corporation (North American), North American Philips Development Corporation (Development), and individual members of Magnavox management who held their positions in July 1975. All corporations involved are chartered in Delaware. T.M.C. is a wholly-owned subsidiary of Development, which in turn is owned entirely by North American. Apparently, Development's only function was to assist North American in the acquisition of Magnavox.

## II

The salient facts appear in the complaint and in a stipulation of the parties.[1] These develop the following scenario:

On August 21, 1974, North American incorporated Development for the purpose of making a tender offer for the Magnavox common shares. Prior to that time, North American and Magnavox were independent, unaffiliated corporations. On August 28, Development offered to buy all Magnavox shares at a price of $8 per share.

The tender offer included a statement informing Magnavox shareholders of Development's intention to acquire the entire equity interest in Magnavox, and advising them of the possible effects thereof, including: (1) delisting of present or future Magnavox shares by the New York Stock Exchange; (2) creation of an unfavorable market for the shares; (3) loss of information rights granted under Rules of the Exchange and under Federal securities law; and (4) depending on the number of shares acquired, the employment of other means of acquisition, particularly: ". . . through open market purchases, through a tender or exchange offer, or by any other means deemed advisable by it or whether to propose a merger, a sale or exchange of assets, liquidation or some other transactions . . . ."

The directors of Magnavox voted to oppose the offer on the grounds of price inadequacy, among other things, and so notified their shareholders by letter issued on August 30. The letter stated, in part, that the "Company was shocked at the inadequacy of the offer of $8 per share in relationship to a book value in excess of $11.00 . . . ."

In September 1974, the respective managements of Magnavox, North American and Development compromised their differences over the terms of the tender offer. They agreed to terms which included an increase in the offer price to $9 per share and, at the request of North American and Development, two-year employment contracts for sixteen officers of Magnavox (including some of the individual defendants) at existing salary levels. As part of the agreement, Magnavox withdrew its opposition to the tender offer. As modified, the offer was thus not opposed by Magnavox and, in response thereto, Development acquired approximately 84.1% of Magnavox's outstanding common stock.

With Development firmly in control of Magnavox, the managements of those two companies, and of North American, then set about acquiring all equity interest in Magnavox through a merger. In May 1975, Development caused the creation of T.M.C. for that purpose.

---

1. For the purpose of the motion to dismiss, the facts are taken as true. *Laventhol, Krekstein,* *Horwath & Horwath v. Tuckman,* Del.Supr., 372 A.2d 168 (1976).

The directors of Magnavox unanimously agreed to the merger with T.M.C. and scheduled a special stockholders meeting for July 24, 1975, to vote on the plan. At the time of this action, four of the nine Magnavox directors were also directors of North American, and three others each had an employment contract, referred to above, with Magnavox and an option to purchase five thousand of North American's common shares, effective on the date of merger. In June 1975, the shareholders of Magnavox were given notice of the meeting with a proxy statement advising on the book value ($10.16) and merger price ($9.00) of the shares, and they were told that approval of the merger was assured since Development's holding alone was large enough to provide the requisite statutory majority. The proxy statement also advised the shareholders of their respective options to accept the merger price or to seek an appraisal under 8 *Del.C.* § 262.

Magnavox had some 75,000 stockholders. All materials disseminated in connection with the tender offer and the merger had a point of origin outside of Delaware. About 225 tender offer documents were mailed into this State and some 75 proxy statements were mailed to Delaware stockholders (and about 150 payment checks were distributed within the State).

The meeting was held in Delaware as scheduled, the proxies were voted here, stockholder approval was given, and the merger was accomplished.[2]

\* \* \* \* \* \*

Thereafter, plaintiffs filed a complaint in the Court of Chancery alleging that: (1) the merger was fraudulent in that it did not serve any business purpose other than the forced removal of public minority shareholders from an equity position in Magnavox at a grossly inadequate price to enable North American, through Development, to obtain sole ownership of Magnavox; (2) in approving the merger, at a cash price per share to the minority which they knew to be grossly inadequate, defendants breached their fiduciary duties to the minority shareholders; and (3) the merger was accomplished in a manner violative of the anti-fraud provision of the Delaware Securities Act. 6 *Del.C.* § 7303. Plaintiffs seek an order nullifying the merger and compensatory damages.

Defendants moved to dismiss the complaint on the ground that it fails to state a claim upon which relief may be granted, arguing that: (1) their actions are expressly authorized by 8 *Del.C.* § 251, and they fully complied therewith; (2) the exclusive remedy for dissatisfaction with the merger is an appraisal under 8 *Del.C.* § 262; and (3) plaintiffs are not entitled to relief under the Securities Act because they did not rely on any purported material misrepresentations, and because they lack standing to sue under the Act and status to maintain a class action.

The Court of Chancery granted the motion to dismiss, ruling that: (1) the merger was not fraudulent merely because it was accomplished without any business purpose other than to eliminate the Magnavox minority shareholders; (2) in any event, plaintiffs' remedy for dissatisfaction with the merger is to seek an appraisal; and (3) plaintiffs are not entitled to relief under the Securities Act because the proxy materials did not have a significant impact on accomplishment of the merger.

### III

We turn, first, to what we regard as the principal consideration in this appeal; namely, the obligation owed by majority shareholders in control of the corporate process to minority shareholders, in the context of a merger under 8 *Del.C.* § 251,[3] of

---

**2.** For other factual details, see 367 A.2d at 1351–3.

**3.** 8 *Del.C.* § 251 provides in part, as follows:

"(a) Any 2 or more corporations existing under the laws of this State may merge into a single corporation, which may be any 1 of the constituent corporations or may consolidate into a new corporation formed by the consolidation, pursuant to an agreement of merger or consolidation, as the case may be, complying and approved in accordance with this section.

two related Delaware corporations. It is, in other words, another round in the development of the law governing a parent corporation and minority shareholders in its subsidiary. Cf. Folk, *The Delaware General Corporation Law*, at 77–81, 331–336; Balotti, *"The Elimination of the Minority Interests by Mergers Pursuant to Section 251 of the General Corporation Law of Delaware"*, 1 *Del.J. of Corp.Law* 63 (1976).

### A.

To state the obvious, under § 251 two (or more) Delaware corporations "may merge into a single corporation." Generally speaking, whether such a transaction is good or bad, enlightened or ill-advised, self-ish or generous—these considerations are beside the point. Section 251 authorizes a merger and any judicial consideration of that kind of togetherness must begin from that premise.

Section 251 also specifies in detail the procedures to be followed in accomplishing a merger. Briefly, these include approvals by the directors of each corporation and by "majority [vote] of the outstanding stock of" each corporation, followed by the execution and filing of formal documents. The consideration given to the shareholders of a constituent corporation in exchange for their stock may take the form of "cash, property, rights or securities of any other corporation." § 251(b)(4). A shareholder

(b) The board of directors of each corporation which desires to merge or consolidate shall adopt a resolution approving an agreement of merger or consolidation. The agreement shall state: (1) The terms and conditions of the merger or consolidation; (2) the mode of carrying the same into effect; (3) the amendments or changes in the certificate of incorporation of the surviving corporation as are desired to be effected by the merger or consolidation, or, if no such amendments or changes are desired, a statement that the certificate of incorporation of 1 of the constituent corporations shall be the certificate of incorporation of the surviving or resulting corporation; (4) the manner of converting the shares of each of the constituent corporations into shares or other securities of the corporation surviving or resulting from the merger or consolidation and, if any shares of any of the constituent corporations are not to be converted solely into shares or other securities of the surviving or resulting corporation, the cash, property, rights or securities of any other corporation which the holders of such shares are to receive in exchange for, or upon conversion of such shares and the surrender of the certificates evidencing them, which cash, property, rights or securities of any other corporation may be in addition to or in lieu of shares or other securities of the surviving or resulting corporation; and (5) such other details or provisions as are deemed desirable, including, without limiting the generality of the foregoing, a provision for the payment of cash in lieu of the issuance or recognition of fractional shares, interests or rights, or for any other arrangement with respect thereto, consistent with the provisions of § 155 of this title. The agreement so adopted shall be executed in accordance with § 103 of this title. Any of the terms of the agreement of merger or consolidation may be made dependent upon facts ascertainable outside of such agreement, provided that the manner in which such facts shall operate upon the terms of the agreement is clearly and expressly set forth in the agreement of merger or consolidation.

(c) The agreement required by subsection (b) of this section shall be submitted to the stockholders of each constituent corporation at an annual or special meeting for the purpose of acting on the agreement. Due notice of the time, place and purpose of the meeting shall be mailed to each holder of stock, whether voting or nonvoting, of the corporation at his address as it appears on the records of the corporation, at least 20 days prior to the date of the meeting. At the meeting, the agreement shall be considered and a vote taken for its adoption or rejection. If a majority of the outstanding stock of the corporation entitled to vote thereon shall be voted for the adoption of the agreement, that fact shall be certified on the agreement by the secretary or assistant secretary of the corporation. If the agreement shall be so adopted and certified by each constituent corporation, it shall then, in addition to the execution required by subsection (b) of this section, be executed, acknowledged and filed and shall become effective, in accordance with § 103 of this title. It shall be recorded in the office of the recorder of the county of this State in which the registered office of each such constituent corporation is located; or if any of the constituent corporations shall have been specially created by a public act of the General Assembly, then the agreement shall be recorded in the county where such corporation had its principal place of business in this State. . . ."

who objects to the merger and is dissatisfied with the value of the consideration given for his shares may seek an appraisal under 8 *Del.C.* § 262.[4]

4. 8 *Del.C.* § 262 provides in part, as follows:

"(a) Appraisal rights under this section shall be available only for the shares of any stockholder who has complied with subsection (b) of this section and has neither voted in favor of the merger nor consented thereto in writing pursuant to § 228 of this title. When used in this section, the word 'stockholder' means a holder of record of stock in a stock corporation and also a member of record of a nonstock corporation; the words 'stock' and 'share' mean and include what is ordinarily meant by those words and also membership or membership interest of a member of a nonstock corporation.

(b) Appraisal rights under this section shall be determined as follows:

(1) If a proposed merger or consolidation for which appraisal rights are provided under this section is to be submitted for approval at a meeting of stockholders, the corporation, not less than 20 days prior to the meeting, shall notify each of its stockholders entitled to such appraisal rights that appraisal rights are available for any or all of the shares of the constituent corporations, and shall include in such notice a copy of this section. Each stockholder electing to demand the appraisal of his shares under this section shall deliver to the corporation, before the taking of the vote on the merger or consolidation, a written demand for appraisal of his shares. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of his shares; provided, however, that such demand must be in addition to and separate from any proxy or vote against the merger. Within 10 days after the effective date of such merger or consolidation, the surviving corporation shall notify each stockholder of each constituent corporation who has complied with this subsection and has not voted in favor of or consented to the merger or consolidation of the date that the merger or consolidation has become effective; or

(2) If the merger or consolidation was approved pursuant to § 228 or § 253 of this title, the surviving corporation, either before the effective date of the merger or within 10 days thereafter, shall notify each of the stockholders entitled to appraisal rights of the effective date of the merger or consolidation and that appraisal rights are available for any or all of the shares of the constituent corporations. A copy of this section shall be included in the notice. The notice shall be sent by certified or registered mail, return receipt requested, addressed to the stockholder at his address as it appears on the records of the corporation. Any stockholder entitled to appraisal rights may, within 20 days after the date of mailing of the notice, demand in writing from the surviving corporation the appraisal of his shares. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of his shares.

.    .    .    .    .

(f) After the determination of the stockholders entitled to an appraisal, the Court shall appraise the shares, determining their fair value exclusive of any element of value arising from the accomplishment or expectation of the merger. Upon application by any stockholder entitled to participate in the appraisal proceeding or by the corporation, the Court may, in its discretion, permit discovery or other pretrial proceedings and may proceed to trial upon the appraisal prior to the final determination of those other stockholders who have complied with this section. Any stockholder whose name appears on the list filed by the corporation pursuant to subsection (d) of this section and who has submitted his certificates of stock to the Register in Chancery, if such is required, may participate fully in all proceedings until the Court shall determine that he is not entitled to appraisal rights under this section.

(g) The Court shall direct the payment of the appraised value of the shares, together with interest, if any, by the surviving or resulting corporation to the stockholders entitled thereto upon the surrender to the corporation of the certificates representing such stock.    .    .    .

(h) The costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances. Upon the application of any party in interest, the Court shall determine the amount of interest, if any, to be paid upon the value of the stock of the stockholders entitled thereto. In making its determination with respect to interest, the Court may consider all relevant factors, including the rate of interest which the corporation has paid for money it has borrowed, if any, during the pendency of the proceeding. Upon application of a stockholder, the Court may order all or a portion of the expenses incurred by any stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorney's fees and the fees and expenses of experts, to be charged pro rata against the value of all of the shares entitled to an appraisal."

Counsel have pointed out to us that subparagraph (h), in its present form, became effective July 1, 1976 and now authorizes the Court to charge expenses (including attorney fees and

### B.

In this appeal it is uncontroverted that defendants complied with the stated requirements of § 251. Thus there is both statutory authorization for the Magnavox merger and compliance with the procedural requirements. But, contrary to defendants' contention, it does not necessarily follow that the merger is legally unassailable. We say this because, (a) plaintiffs invoke the fiduciary duty rule which allegedly binds defendants; and (b) Delaware case law clearly teaches that even complete compliance with the mandate of a statute does not, in every case, make the action valid in law.

The last stated proposition is derived from such cases as *Schnell v. Chris-Craft Industries, Inc.*, Del.Supr., 285 A.2d 437, 439 (1971) (which involved advancement of the date of an annual meeting, accomplished in compliance with the relevant statute) wherein this Court said that "... inequitable action does not become permissible simply because it is legally possible;" and from *Guth v. Loft, Inc.*, Del.Supr., 23 Del.Ch. 255, 5 A.2d 503, 511 (1939), in which the Court, responding to an argument for a narrow examination of issues, said that "[t]he question [at issue] is not one to be decided on narrow or technical grounds, but upon broad considerations of corporate duty and loyalty." We apply this approach and reject any contention that statutory compliance insulates the merger from judicial review.

### C.

From this premise we must now analyze the encounter between the exercise of a statutory right and the performance of the alleged fiduciary duty. As we have noted, § 251, by its terms, makes permissible that which the North American side of this dispute caused to be done: the merger of T.M.C. into Magnavox. We must ascertain, however, what restraint, if any, the duty to minority stockholders placed on the exercise of that right.

Plaintiffs contend that the Magnavox merger was fraudulent because it was made without any ascertainable corporate business purpose and was designed solely to freeze out the minority stockholders. After a review of the cases, the Trial Court concluded that to the extent the complaint charges that the merger was fraudulent because it did not serve a business purpose of Magnavox, it fails to state a claim upon which relief may be granted. Our analysis leads to a different result, not on the basis of fraud but on application of the law governing corporate fiduciaries.

The statute is silent on the question of whether a merger may be accomplished only for a valid business purpose, but two recent unreported decisions seem to suggest that such a showing is required under Delaware law. See *Pennsylvania Mutual Fund, Inc. v. Todhunter International, Inc.*, Del. Ch.C.A. 4845 (August 5, 1975), and *Tanzer v. International General Industries, Inc.*, Del.Ch.C.A. 4945 (December 23, 1975).[5]

---

the expense of employing experts) "against the value of all of the shares entitled to an appraisal." Realistically, that may broaden the scope of the value inquiry in an appraisal proceeding but it is not significant here.

5. In *Todhunter*, the Court granted an order temporarily restraining the accomplishment of a merger which plaintiff alleged "constitute[d] an unlawful freeze-out of . . . [its] interest as a stockholder . . . ." The Chancellor commented:

"... I have some doubt as to whether or not the merger under attack has a valid business purpose. In other words, this is probably or possibly not a case in which a dissenting stockholder is merely entitled to an appraisal because of his unwillingness to

continue in a changed business. Here there is to be no change in the business but merely an elimination of unwanted minority stockholders.

I feel therefore that there is some possibility on further argument and development of the case of a showing of illegality of this plan by reason of it being a possible manipulation of corporate control for private purposes with no proper business purpose in mind."

*Tanzer*, on the other hand, involved a request for a preliminary injunction preventing the merger of two related corporations. The need for a finding of business purpose is implied in the following statement by the Court:

"The question presented is whether the merger should be enjoined because the pur-

Neither decision was by this Court and the issue is one of first impression here.

Any inquiry into the business purpose of a merger immediately leads to such questions as: "Whose purpose?" or "Whose business?" Is it that of the corporations whose shares are (or were) held by the minority? If so, it may well be that the business purpose of that company (*qua* company) is advanced by the merger, but that could be an academic result if the complainants (as here) are no longer shareholders because they have been cashed-out. On the other hand, if the corporation in which the complainants held shares "vanishes" in the merger, inquiry as to purpose may be unrealistic if not academic. And if the business purpose of the parent (or dominant) corporation should ·be examined (as defendants argue), minority shareholders of the subsidiary (or controlled corporation) may have undue difficulty in raising and maintaining the issue.

The point of this discussion is not that an exploration of the business purpose for a merger is without merit. It may well be necessary to examine that purpose in many mergers under judicial review. But as a threshold consideration in this opinion, it is not helpful in sorting out rights of the parties. It seems to us, rather, that the approach to the purpose issue should be made by first examining the competing claims between the majority and minority stockholders of Magnavox. That is what is really up for decision here, and so we look to the standards governing that relationship.

### D.

■ It is a settled rule of law in Delaware that Development, as the majority stockholder of Magnavox, owed to the minority stockholders of that corporation, a fiduciary obligation in dealing with the latter's property. *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 33 Del.Ch. 293, 93 A.2d 107, 109–10 (1952). In that leading "interested merger" case, this Court recognized as established law in this State that the dominant corporation, as a majority stockholder standing on both sides of a merger transaction, has "the burden of establishing its entire fairness" to the minority stockholders, sufficiently to "pass the test of careful scrutiny by the courts." See 93 A.2d at 109, 110. See also *Bastian v. Bourns, Inc.*, Del. Ch., 256 A.2d 680, 681 (1969), aff'd Del. Supr., 278 A.2d 467 (1970); and *David J. Greene & Co. v. Dunhill International, Inc.*, Del.Ch., 249 A.2d 427, 430 (1968). The fiduciary obligation is the cornerstone of plaintiffs' rights in this controversy and the corollary, of course, is that it is likewise the measure of the duty owed by defendants.[6]

■ Delaware courts have long announced and enforced high standards which govern the internal affairs of corporations chartered here, particularly when fiduciary relations are under scrutiny. It is settled

---

pose is to serve the interest of the parent. It should be noted in this regard that IGI has a legitimate and present and compelling business reason to be the sole owner of Kliklok. IGI is not freezing out the minority just for the purpose of freezing out the minority."

6. The Delaware corporation law applicable to a merger has recently been the subject of a decision by the United States Supreme Court. In *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Court defined the "reach and coverage" of Federal Securities law in the context of the so-called Delaware "short form" merger. See 8 *Del.C.* § 253 which has special provisions permitting a merger in "any case in which at least 90% of the outstanding shares of each class of the stock of a corporation or corporations is owned by another corporation and 1 of the corpora-

tions is a corporation of this State . . . ." That statute is not involved in this case but it is comparable in some respects to § 251 and, more significantly, *Santa Fe* is a current confirmation by the Supreme Court of the responsibility of a State to govern the internal affairs of corporate life. Quoting from *Cort v. Ash*, 422 U.S. 66, 84, 95 S.Ct. 2080, 2091, 45 L.Ed.2d 26 (1975), Mr. Justice White explained the rationale for the decision in these words:

"'Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation.'" (Court's emphasis.)
97 S.Ct. at 1304.

Delaware law, for example, that corporate officers and directors, *Guth v. Loft, Inc.*, supra, and controlling shareholders, *Sterling v. Mayflower Hotel Corp.*, supra; *Bennett v. Breuil Petroleum Corp.*, 34 Del.Ch. 6, 99 A.2d 236 (1953), owe their corporation and its minority shareholders a fiduciary obligation of honesty, loyalty, good faith and fairness. Other cases applying that equitable doctrine include *Schnell v. Chris-Craft Industries, Inc.*, supra; *Kaplan v. Fenton*, Del.Supr., 278 A.2d 834 (1971); *Dolese Bros. Co. v. Brown*, Del.Supr., 39 Del.Ch. 1, 157 A.2d 784 (1960); *Johnston v. Greene*, Del.Supr., 35 Del.Ch. 479, 121 A.2d 919 (1956); *Italo-Petroleum Corporation of America v. Hannigan*, Del.Supr., 1 Terry 534, 14 A.2d 401 (1940); *Condec Corporation v. Lunkenheimer Company*, 43 Del.Ch. 353, 230 A.2d 769 (1967); *Craig v. Graphic Arts Studio, Inc.*, 39 Del.Ch. 477, 166 A.2d 444 (1960); *Brophy v. Cities Service Co.*, 31 Del.Ch. 241, 70 A.2d 5 (1949).

■ The classic definition of the duty was stated by Chief Justice Layton in *Guth*, where he wrote:

". . . While technically not trustees, . . . [corporate directors] stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale."

5 A.2d at 510. While that comment was about directors, the spirit of the definition is equally applicable to a majority stockholder in any context in which the law imposes a fiduciary duty on that stockholder for the benefit of minority stockholders. We so hold.

\* \* \* \* \* \*

■ Defendants concede that they owe plaintiffs a fiduciary duty but contend that, in the context of the present transaction, they have met that obligation by offering fair value for the Magnavox shares. And, say defendants, plaintiffs' exclusive remedy for dissatisfaction with the merger is to seek an appraisal under § 262. We disagree. In our view, defendants cannot meet their fiduciary obligations to plaintiffs simply by relegating them to a statutory appraisal proceeding.[7]

At the core of defendants' contention is the premise that a shareholder's right is exclusively in the *value* of his investment, not its *form*. And, they argue, that right is protected by a § 262 appraisal which, by definition, results in fair value for the shares. This argument assumes that the right to take is coextensive with the power to take and that a dissenting stockholder has no legally protected right in his shares, his certificate or his company beyond a right to be paid fair value[8] when the ma-

---

**7.** See Vorenberg, *Exclusiveness of the Dissenting Stockholder's Appraisal Right*, 77 Harv.L.R. 1189 (1964).

**8.** That argument was rejected in *Jutkowitz v. Bourns*, Cal.Super.Ct. C.A. 000268 (Nov. 19, 1975), wherein the Court correctly summarized some of the values besides money which may be at stake in a "going-private" merger:

"Money may well satisfy some or most minority shareholders, but others may have differing investment goals, tax problems, a belief in the ability of . . . management to make them rich, or even a sentimental attachment to the stock which leads them to have a different judgment as to the desirability of selling out."

Cf. *Bryan v. Brock & Blevins Co., Inc.*, 5 Cir., 490 F.2d 563 (1974); *Berkowitz v. Power/Mate Corporation*, 135 N.J.Super. 36, 342 A.2d 566 (1975).

jority is ready to do this. Simply stated, such an argument does not square with the duty stated so eloquently and so forcefully by Chief Justice Layton in *Guth.*

We agree that, because the power to merge is conferred by statute, every stockholder in a Delaware corporation accepts his shares with notice thereof. See *Federal United Corporation v. Havender,* Del.Supr., 24 Del.Ch. 318, 11 A.2d 331, 338 (1940). Indeed, some Delaware decisions have noted that to "the extent authorized by statute, . . . [mergers] are 'encouraged and favored.' " *Folk* supra at 332. Beyond question, the common law right of a single stockholder to simply veto a merger is gone. *Id.* at 331. But it by no means follows that those in control of a corporation may invoke the statutory power conferred by § 251, a power which this Court in *Havender,* supra, said was "somewhat analogous to the right of eminent domain," 11 A.2d at 338, when their purpose is simply to get rid of a minority.[9] On the contrary, as we shall ultimately conclude here, just as a minority shareholder may not thwart a merger without cause, neither may a majority cause a merger to be made for the sole purpose of eliminating a minority on a cash-out basis.

### E.

Plaintiffs allege that defendants violated their respective fiduciary duties by participating in the tender offer and other acts which led to the merger and which were designed to enable Development and North American to, among other things:

"[C]onsummate a merger which did not serve any valid corporate purpose or compelling business need of Magnavox and whose sole purpose was to enable Development and North American to obtain sole ownership of the business and assets of Magnavox at a price determined by defendants which was grossly inadequate and unfair and which was designed to give Development and North American a disproportionate amount of the gain said defendants anticipated would be recognized from consummation of the merger."

Defendants contend, and the Court of Chancery agreed, that the "business purpose" rule does not have a place in Delaware's merger law. In support of this contention defendants cite: *Stauffer v. Standard Brands, Incorporated,* Del.Supr., 187 A.2d 78 (1962); *Federal United Corporation v. Havender,* supra; *David J. Greene & Co. v. Schenley Industries, Inc.,* Del.Ch., 281 A.2d 30 (1971); *Bruce v. E. L. Bruce Company,* 40 Del.Ch. 80, 174 A.2d 29 (1961); and *MacCrone v. American Capital Corporation,* D.Del., 51 F.Supp. 462 (1943).

Each of these cases involved an effort to enjoin or attack a merger and each was unsuccessful. To this extent they support defendants' side of the controversy. But none of these decisions involved a merger in which the minority was totally expelled *via* a straight "cash-for-stock" conversion in which the only purpose of the merger was, as alleged here, to eliminate the minority.

In *Stauffer,* a § 253 case, the Court carefully examined plaintiffs' charges of majority oppression and concluded that the complaint alleged "nothing but a difference of opinion as to [the] value" of the converted shares. 187 A.2d at 80. Viewing the case in this light, the Court ruled that a statutory appraisal was plaintiffs' exclusive medium of relief. We do not read the decision

---

**9.** The Trial Judge, in blunt and descriptive language, addressed the "going private" problem in these words:

"Admittedly there seems something fundamentally inequitable about such a stark progression of events and perhaps a use of the Delaware statutes should not be permitted which would allow those with controlling interests who originally sought public participation to later kick out public investors for the sole reason that they have outlived their utility to those in control and are made easy pickings by existing market conditions."

367 A.2d at 1358. For a more detailed discussion of "going private," see: *Going Private,* 84 Yale L.J. 903 (1975).

as approving a merger accomplished solely to freeze-out the minority without a valid business purpose.

Without question, *Havender* is an important opinion under our merger law, but we do not regard it as precedent here because the Merger Statute in effect at the time it was written did not authorize a pure cash-for-shares conversion. Moreover, *Havender* stands for the proposition that a merger must be "fair and equitable in the circumstances of the case" in order to withstand the veto of a dissenting shareholder. See 11 A.2d at 338.

Likewise, neither *Shenley* nor *Bruce* involved a "cash-out merger," the *sole* purpose of which was to eliminate minority stockholders. Accordingly, those cases are inapposite. Any statement therein which seems to be in conflict with what is said herein must be deemed overruled.

■ We hold the law to be that a Delaware Court will not be indifferent to the purpose of a merger when a freeze-out of minority stockholders on a cash-out basis is alleged to be its sole purpose. In such a situation, if it is alleged that the purpose is improper because of the fiduciary obligation owed to the minority, the Court is duty-bound to closely examine that allegation even when all of the relevant statutory formalities have been satisfied.

Consistent with this conclusion is *Bennett v. Breuil Petroleum Corp.*, supra, wherein plaintiff alleged that the dominant shareholder caused the issuance of new shares to impair his interest and to force him out of the corporation upon management's terms. At the outset the Court said:

"As a starting point it must be conceded that action by majority stockholders having as its primary purpose the 'freezing out' of a minority interest is actionable without regard to the fairness of the price."

99 A.2d at 239. Thereafter, the Chancellor denied defendants' motions for dismissal and summary judgment, ruling:

"It seems to me that plaintiff has set forth a legally recognized claim and the pleadings and affidavits have raised a *substantial factual dispute as to the legal propriety of the motives of the corporate defendant and its controlling stockholder* which can only be resolved by a hearing." (Emphasis added.)

*Id.*

And in *Condec Corporation v. Lunkenheimer Company*, supra, the Court applied a similar approach in an action for cancellation of stock alleged to be issued for the purpose of retaining corporate control, stating that "shares may not be issued for an improper purpose such as a take-over of voting control from others." 230 A.2d at 775. See *Yasik v. Wachtel*, 25 Del.Ch. 247, 17 A.2d 309 (1941). Quoting from the above language in *Bennett*, the Court reaffirmed that the "corporate machinery may not be manipulated so as to injure minority stockholders," 230 A.2d at 775, and ordered the shares cancelled.

Similarly, in *Schnell v. Chris-Craft Industries, Inc.*, supra, this Court examined the purpose for advancement of the date of an annual meeting when it was allegedly done to perpetuate management in office. In ordering that the advanced date be nullified, Chief Justice (then Justice) Herrmann answered management's claim that strict statutory compliance insulated its action from attack by saying "that inequitable action does not become permissible simply because it is legally possible." 285 A.2d at 439.[10]

■ Read as a whole, those opinions illustrate two principles of law which we approve: First, it is within the responsibility of an equity court to scrutinize a corporate act when it is alleged that its purpose violates the fiduciary duty owed to minority stockholders; and second, those who control the corporate machinery owe a fiduciary duty to the minority in the exercise thereof over corporate powers and property, and

10. Other cases following the *Bennett-Condec-Schnell* approach include *Baron v. Allied Artists Pictures Corporation*, Del.Ch., 337 A.2d 653 (1975); *Petty v. Penntech Papers, Inc.*, Del.Ch., 347 A.2d 140 (1975); and, most recently, *Todhunter*, supra.

the use of such power to perpetuate control is a violation of that duty.

By analogy, if not *a fortiori*, use of corporate power solely to *eliminate* the minority is a violation of that duty. Accordingly, while we agree with the conclusion of the Court of Chancery that this merger was not fraudulent merely because it was accomplished without any purpose other than elimination of the minority stockholders, we conclude that, for that reason, it was violative of the fiduciary duty owed by the majority to the minority stockholders.

We hold, therefore, that a § 251 merger, made for the sole purpose of freezing out minority stockholders, is an abuse of the corporate process; and the complaint, which so alleges in this suit, states a cause of action for violation of a fiduciary duty for which the Court may grant such relief as it deems appropriate under the circumstances.

This is not to say, however, that merely because the Court finds that a cash-out merger was not made for the sole purpose of freezing out minority stockholders, all relief must be denied to the minority stockholders in a § 251 merger.[11] On the contrary, the fiduciary obligation of the majority to the minority stockholders remains and proof of a purpose, other than such freeze-out, without more, will not necessarily discharge it. In such case the Court will scrutinize the circumstances for compliance with the *Sterling* rule of "entire fairness" and, if it finds a violation thereof, will grant such relief as equity may require. Any statement in *Stauffer* inconsistent herewith is held inapplicable to a § 251 merger.

\*    \*    \*    \*    \*    \*

Accordingly, as to this facet of the appeal, we reverse.

## IV

Finally, we consider plaintiffs' claim that defendants violated the Delaware Securities Act, 6 *Del.C.* § 7303,[12] by issuing, through the proxy documents, false and misleading statements of material fact relating to the merger and by failing to disclose other material facts pertinent thereto.[13]

---

11. Plaintiffs contend that a "business purpose" is proper in a merger only when it serves the interests of the subsidiary corporation; defendants contend, on the other hand, that if any such purpose is relevant, it is only that of the parent corporation. Since resolution of that question is not necessary to the disposition of this appeal, and since it was not central in the briefing and argument, we leave it to another day.

12. 6 *Del.C.* § 7303 provides:
"It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:
(1) To employ any device, scheme, or artifice to defraud;
(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

13. The complaint charges, *inter alia*, that defendants:

"(b) Did not disclose or even mention that Magnavox's directors initially had urged Magnavox's stockholders to reject Development's tender offer.
(c) Failed to disclose the reasons advanced by Magnavox's management in opposition to Development's tender offer, including the fact that Magnavox's book value was substantially in excess of the per share price offered in the original and modified tender offers.
(d) Failed to disclose that Magnavox's management agreed to withdraw their opposition to Development's tender offer and to cooperate with Development in acquiring control of Magnavox only after Development agreed to permit 16 officers of Magnavox including defendants DiScipio, Minahan, and Schrey to retain their jobs with Magnavox for a period of at least two years at their then salaries.

(g) Concealed the true reason for the merger: namely, that, at the time of the proposed merger, the depressed market price per share of Magnavox was being used as a pretext for a merger which would enable the defendants to obtain sole ownership of the business and assets of Magnavox at a per share merger price determined by defendants which was grossly unfair and inadequate."

Defendants respond to the charges in two ways. First, they challenge plaintiffs' standing to maintain a suit under the Act and, second, they argue that the Act is not applicable because Development held 84.1% of the Magnavox shares and thus, in fact, the proxy statements could not have had an impact on accomplishment of the merger.

The Chancery Court concluded that § 7303 must be read in conjunction with § 7323(a)(2) [14] and that "to be actionable, the sale or purchase must have been caused by the false representation or the material omission in the statements offered to induce the sale or purchase." 367 A.2d at 1361. Since Development's interest was large enough to approve the merger regardless of how the remaining shareholders voted, the Vice Chancellor reasoned that plaintiffs failed to state a claim because there could not be a causal relationship between the proxy materials and consummation of the merger. The motion to dismiss was granted without reaching the standing issue.

The Securities Act became law in this State on July 1, 1973 and this appears to be the first reported case construing it. In the view we take of the case, a detailed examination of its purpose or provision is not required. We note, however, that with some specificity the Act requires registration of securities offered or sold here, states that certain representations are unlawful, creates a registration procedure for broker-dealers and investment advisors, and provides for administration by the Attorney General or a designated Deputy.

■ But, detailed as the Act is, it does not include legislative findings as to purpose, nor are its objectives stated in even the broadest of terms. And so we must divine the Assembly's intention from a reading of the statute as a whole. So viewed, we read the Securities Act as a Blue Sky Law governing transactions which are subject to Delaware jurisdiction under traditional tests. To state it another way, we do not read the Act as an attempt to introduce Delaware commercial law into the internal affairs of corporations merely because they are chartered here. Of course, a Delaware corporation is bound by the Act, if it is otherwise applicable. But it is not bound simply because the company is incorporated here.

■ There is, of course, a presumption that a law is not intended to apply outside the territorial jurisdiction of the State in which it is enacted. *Hilton v. Guyot,* 159 U.S. 113, 163, 16 S.Ct. 139, 40 L.Ed. 95 (1894); 73 *Am.Jur.*2d Statutes §§ 357–59; and that principle is applicable to a Blue Sky Law. *Brocalsa Chemical Co. v. Langsenkamp,* 6 Cir., 32 F.2d 725 (1929); *McBreen v. Iceco, Inc.,* 12 Ill.App.2d 372, 139 N.E.2d 845 (1956); *Gillespie v. Blood,* 81 Utah 306, 17 P.2d 822 (1932); 69 *Am.Jur.*2d Securities Regulation—State § 8; 79 *C.J.S. Supp.* Securities Regulation § 189; 14 Fletcher, *Cyclopedia Corporations* § 6742 (1975).

■ Plaintiffs are residents of Pennsylvania and were not solicited here. Nor does it appear that the contract was made in Delaware nor that any part of the "sale" occurred here. It follows that the Delaware Securities Act does not apply and that the judgment of the Court of Chancery was correct in so ruling.[15]

---

**14.** 6 *Del.C.* § 7323(a)(2) provides:

"[Any person who] [o]ffers, sells or purchases a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading (the buyer or seller not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of the untruth or omission, is liable to the person buying or selling the security from or to him, who may sue either at law or in equity to recover the consideration paid for the security, together with the interest at the legal rate from the date of payment costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security."

**15.** In their reply brief plaintiffs ask for an opportunity to amend the complaint, if this Court

We are not persuaded that because the corporate merger vote was held in Delaware this is a sufficient connection with the alleged fraud to permit plaintiffs to invoke the Act. That is simply too fragile a basis on which to establish subject matter jurisdiction over an alleged fraud in Pennsylvania or over a contract made in New York. And plaintiffs' arguments based on registration of the merger documents in Delaware, see 8 *Del.C.* § 103, and the statutory situs of the Magnavox stock in this State, 8 *Del.C.* § 169, are equally tenuous and we reject them for the same reason.

\* \* \* \* \* \*

As to this facet of the appeal, we affirm.

\* \* \* \* \* \*

The judgment of the Court of Chancery is reversed in part and affirmed in part.

McNEILLY, Justice (concurring):

I concur in the result, and I agree with the holding of the majority that a § 251 merger, made for the sole purpose of freezing out minority stockholders, is an abuse of the corporate process; and that the complaint, which so alleges in this suit, states a cause of action for violation of a fiduciary duty for which the Court may grant such relief as it deems appropriate under the circumstances. I also agree with the learned and eloquent analysis of the Delaware case law on the subject of mergers made by Justice Duffy in his opinion.

In these cases of going private, be they mergers under § 251 or § 253, it is my opinion that *Sterling v. Mayflower*, Del. Supr., 33 Del.Ch. 293, 93 A.2d 107 (1952), establishes an avenue for judicial scrutiny with a firm foundation based upon factual determinations of fundamental fairness and economic reasonableness which should be our guideline for future cases. It is not disputed that majority stockholders owe to the minority a fiduciary obligation in dealing with the latter's holdings, and full compliance with the statutory requirements to

effect a merger does not insulate a breach of that duty from judicial intervention, although it may affect the relief afforded. In my opinion a complaint alleging such a breach states a cause of action, shifting the burden to the majority to establish the entire fairness of the transaction. To determine whether that burden has been met under *Sterling*, I think the Court must scrutinize the business purpose, or economic necessity, desirability and feasibility involved, evidence of self-serving, manipulation, or overreaching, and all other relevant factors of intrinsic fairness or unfairness. Upon finding a breach of the fiduciary duty owed, the Court must then grant such relief as the circumstances require, by injunction, appraisal, damages, or other available equitable relief, if any, keeping in mind, however, the continuing legislative approval of mergers and the judicially mandated avoidance of their disruption by dissenting stockholders.

---

affirms the Chancery Court's decision as to the § 7303 claim. We express no view on that

application, which is a matter to be considered by the Trial Court.