DR. R. EASTWOOD PERL, and all others similarly situated, Plaintiffs-Appellees, *v.* IU INTERNATIONAL CORPORATION, et al., Defendants-Appellants

NO. 7300

MARCH 6, 1980

RICHARDSON, C.J., OGATA, MENOR, JJ.,
RETIRED JUSTICES MARUMOTO AND KOBAYASHI,
ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY KOBAYASHI, J.

This is an interlocutory appeal from the judgment of the trial court setting aside the corporate merger of IUH Corporation (IUH) and C. Brewer and Company, Limited (Brewer), both Hawaii corporations.

The basic issue is whether the merger which was concluded herein was between two Hawaii corporations, or between a Hawaii corporation and a foreign corporation.

Dr. R. Eastwood Perl (Perl), a resident of the State of New York and a minority shareholder of common stock of Brewer, filed a complaint, on behalf of herself and all other minority stockholders of Brewer who are similarly situated, against IU International Corporation, a Maryland Corporation (IU), IUH, Brewer, the individual directors of Brewer, certain directors and officers of IU and the First Boston Corporation (appellants).

Perl sought to enjoin and/or set aside the merger between IUH and Brewer, alleging misrepresentations and false statements in the merger proxy statement. Perl further alleged that the Directors of Brewer breached their fiduciary duties in the formulation and presentation of the merger, and by not seeking alternative action or greater benefits than the proposed merger. On appeal, Perl contended that the merger was effected for the sole purpose of freezing out the minority shareholders.

The relevant facts are as follows:

On July 28, 1977, IUH was incorporated under the laws of Hawaii. One hundred percent of the stock of IUH (1,000 shares) was issued to IU Investment Corporation (IUI), a Delaware corporation wholly-owned by IU.

On August 14, 1978, IUH merged with Brewer.

Prior to the merger, Brewer had issued and outstanding approximately 4,571,800 shares of common stock. About fifty-four percent of the Brewer stock was owned by IUI; approximately two million shares were held by minority stockholders. Perl was the beneficial owner of 1,000 shares of Brewer common stock.

The Brewer stockholders' vote on the merger was 3,634,257 shares in favor (80%); 222,494 shares against (5%); and 694,349 shares not voted (15%).

To effectuate the merger, IUH and Brewer, among other defendants, executed two documents entitled "Agreement" and "Merger Agreement."

The "Agreement," in relevant part, states as follows:

AGREEMENT
by and among
IU INTERNATIONAL CORPORATION,
IU INVESTMENT CORPORATION,
IUH CORPORATION
and
C. BREWER AND COMPANY, LIMITED

AGREEMENT, dated the        day of        , 1978, by and among IU International Corporation, a Maryland corporation ("IU"), with its principal office at 1105 North Market Street, Wilmington, Delaware 19801; IU Investment Corporation, a Delaware corporation ("IUI"), with its principal office at 1105 North Market Street, Wilmington, Delaware 19801; IUH Corporation ("IUH"), a Hawaii corporation, with its principal office at           , and C. Brewer and Company, Limited, a Hawaii corporation ("Brewer"), with its principal office at 827 Fort Street, Honolulu, Hawaii 96801.

IUI, a wholly-owned subsidiary of IU, owns 2,435,162 shares or approximately 54% of the outstanding and issued capital stock of Brewer. IUH is a wholly-owned subsidiary of IUI which has been formed for the purpose of consummating the transactions contemplated by this Agreement. IU, IUI, IUH and Brewer have agreed that it is advisable for IUH to merge into Brewer upon the terms and conditions hereinafter set forth, whereby the issued and outstanding capital stock of Brewer, owned by stockholders other than IUI, would be exchanged for $1.36 Convertible Preferred Stock of IU.

NOW, THEREFORE, the parties to this Agreement (the "Agreement"), in consideration of the mutual covenants herein contained, do hereby agree as follows:

## ARTICLE I

### MERGER

1.01 *Merger.* Subject to the terms and conditions herein set forth, the parties hereto agree to effect a merger of IUH with and into Brewer as the surviving corporation in accordance with the Agreement of Merger attached hereto as Annex 1 (the "Merger Agreement").

1.02 Prior to the Closing Date, as defined in Section 6.01 hereof, IU shall take the necessary corporate action to authorize the $1.36 Convertible Preferred Stock of IU with the designations, preferences, rights, voting powers, restrictions or qualifications and dividend, redemption or conversion provisions as set forth in Annex 2 hereto. . . .[1] IU shall, on the Closing Date, issue to IUH a sufficient number of shares of $1.36 Convertible Preferred Stock to effect the merger in the manner provided for in the Merger Agreement.

## ARTICLE II

### CAPITAL STOCK OF THE SURVIVING CORPORATION

2.01 *Conversion of Shares.* The manner of converting the shares of Brewer and IUH into shares of the

---

[1] Annex 2, the "Proposed Articles Supplementary to the Charter of IU International Corporation Defining the Terms of the $1.36 Convertible Preferred Stock of IU," specifically outlines the allowability and manner of redemption of the preferred stock, and the conversion rights of the holder of any such shares.

surviving corporation and of distributing shares of $1.36 Convertible Preferred Stock of IU in lieu of shares of the surviving corporation shall be as set forth in Article III of the Merger Agreement.

. . . .

## ARTICLE VI

### CLOSING DATE AND EFFECTIVE DATE OF THE MERGER

6.01 *Closing Date*.   Within ten business days after obtaining (i) the requisite approvals of the stockholders and directors of Brewer, (ii) the requisite tax ruling, and (iii) a determination of the number of shares Brewer Common Stock, if any, as to which dissenters' rights are being exercised, (if necessary pursuant to Sections 5.01(j) and 5.02(i)), a meeting (the "Closing") shall take place at the offices of Brewer in Honolulu, Hawaii, at which the parties to this Agreement will exchange certificates, opinions and other documents in order to determine whether any condition exists which would permit any of the parties to this Agreement to terminate this Agreement. If no such condition then exists, or if no party elects to exercise any right it may have to terminate this Agreement, the parties shall certify, execute and acknowledge the Merger Agreement to comply with applicable filing and recording requirements. The date of such certification, execution and acknowledgment shall be the Closing Date.

6.02 *Effective Date*.

On the Closing Date, an executed counterpart of the Merger Agreement shall be filed with the Director of Regulatory Agencies of the State of Hawaii and the merger shall become effective upon the completion of such filing. The date of such completion of filing shall be the Effective Date.

. . . .

The "Merger Agreement," in relevant part, states as follows:

## MERGER AGREEMENT

of

### IUH CORPORATION
(a Hawaii corporation)

into

### C. BREWER AND COMPANY, LIMITED
(a Hawaii corporation)

AGREEMENT OF MERGER dated this　　　day of 　　　, 1978 by and between 'C. Brewer and Company, Limited ("Brewer") a Hawaii corporation, and IUH Corporation ("IUH"), a Hawaii corporation (the two corporate parties hereto being sometimes collectively referred to as the "Constituent Corporations").

Brewer is a corporation organized under the laws of the Kingdom of Hawaii and existing under the laws of the State of Hawaii, with its principal office at 827 Fort Street, Honolulu, Hawaii 96801. Brewer's authorized capital stock consists of 1,000,000 shares of Preferred Stock, without par value, and 6,000,000 shares of Common Stock, without par value, of which shares of Common Stock, and no shares of Preferred Stock, are issued and outstanding.

IUH is a corporation organized and existing under the laws of the State of Hawaii and has authorized capital stock of 1,000 shares, without par value, all of which are outstanding and held by IU Investment Corporation, a Delaware corporation and a wholly owned subsidiary of IU International Corporation, a Maryland corporation (hereinafter sometimes called "IU").

The parties have agreed to a merger of IUH with and into Brewer under the following terms and conditions:

## ARTICLE I

### CORPORATE EXISTENCE OF SURVIVING CORPORATION

In accordance with this Merger Agreement, IUH shall be merged into Brewer in the manner and with the effect provided by the statutes of Hawaii. The separate existence of IUH shall cease as soon as the merger shall become effective, and thereupon IUH shall be merged into Brewer which shall be the surviving corporation (hereinafter sometimes referred to as the "Surviving Corporation"), and shall continue to exist under, and be governed by, the laws of the State of Hawaii. The time at which the merger becomes effective is herein referred to as the "Effective Date". The name of the Surviving Corporation shall be "C. Brewer and Company, Limited".

## ARTICLE II

### CHARTER OF INCORPORATION AND
### BYLAWS OF SURVIVING CORPORATION

(A) No change in the Charter of Incorporation of Brewer, which shall constitute the Charter of Incorporation of the Surviving Corporation, will be effected by the merger. . . .

(B) No change shall be made in the Bylaws of Brewer which shall constitute the Bylaws of the Surviving Corporation.

## ARTICLE III

### CAPITAL STOCK OF THE SURVIVING CORPORATION

(A) The manner of converting the shares of the Constituent Corporations into shares of the Surviving Corporation and or distributing assets of the Constituent Corporations to stockholders of the Constituent Corporations shall be as hereinafter set forth in this Article III.

(B) Each outstanding share of capital stock of IUH issued and outstanding immediately prior to the Effective Date shall thereupon be converted into and become 4,550 shares of Common Stock of the Surviving Corporation. Each share of such Common Stock issued pursuant to this section shall be fully paid and nonassessable.

(C) Each share of Common Stock of Brewer issued and outstanding immediately prior to the Effective Date (other than (i) shares held by Brewer as treasury stock and shares owned by IU Investment Corporation, all of which shares shall be cancelled and extinguished on the Effective Date, and (ii) dissenting shares, as defined in Section 417-21, Hawaii Revised Statutes, which shall have the rights and shall be extinguished as provided by Hawaii Law), shall upon the Effective Date, by virtue of the merger and without any action on the part of the holder thereof, be deemed cancelled and in lieu of shares of the Surviving Corporation there shall be distributed with respect to each share of Common Stock of Brewer so cancelled one share of fully paid and nonassessable $1.36 Convertible Preferred Stock of IU.

(D) The Common Stock of Brewer so exchanged is herein sometimes referred to as the "Converted Brewer Stock". From and after the Effective Date each certificate which, prior to the Effective Date, represented shares of Converted Brewer Stock shall evidence ownership of $1.36 Convertible Preferred Stock of IU on the basis hereinbefore set forth. The aforesaid exchange shall be complete and effective on the Effective Date without regard to the date or dates upon which outstanding certificates representing Converted Brewer Stock are surrendered for certificates for IU Common Stock as provided hereinafter.

(E) As promptly as practicable after the Effective Date, each holder of an outstanding certificate or certificates theretofore representing shares of Converted Brewer Stock shall surrender the same to an agent or

agents designated by the Surviving Corporation, and such holder shall be entitled upon such surrender to receive in exchange therefor certificates representing the number of shares of $1.36 Convertible Preferred Stock of IU into which the shares of Converted Brewer Stock theretofore represented by the certificate or certificates so surrendered shall have been exchanged as aforesaid. Dividends payable after the Effective Date to holders of record in respect of shares of IU Preferred Stock into which certificates for shares of Converted Brewer Stock shall be exchangeable, shall not be paid to holders of such certificates until such certificates are surrendered for exchange as aforesaid and no interest shall accrue with respect to such dividends.

. . . .

After the vote on the merger, the merger agreement between IUH and Brewer was filed with the Office of the Director of Regulatory Agencies pursuant to the provisions of Section 417-8,[2] Hawaii Revised Statutes (HRS).

In seeking to enjoin and/or set aside the merger of IUH and Brewer, Perl contended below that rather than a merger between two domestic corporations requiring a 75% affirma-

---

[2] HRS § 417-8 reads, in pertinent part, as follows:

The agreement so approved, executed, and acknowledged, and the certificates of its approval by each constituent corporation in accordance with this part shall, subject to sections 417-9 and 417-10, be filed in the office of the director of regulatory agencies, and the merger or consolidation shall become effective under this part at the day, hour, and minute of the filing of the agreement and all necessary certificates of its approval by each constituent corporation in accordance with this part, unless a subsequent day, hour, and minute shall be specified in the agreement. . . . A copy of the agreement, certified by the director, shall have the same force in evidence as the original and, except as against the State, shall be conclusive evidence of the performance of all conditions precedent to the merger or consolidation, and the creation or existence of the surviving or consolidated corporation.

Appellants claim that under HRS § 417-8 the validity of the Brewer-IUH merger is conclusive as against Perl. The only party who may file suit to challenge a consummated merger, appellants argue, is the State of Hawaii. We disagree. See HRS § 417-29, discussed infra.

tive vote of the stockholders[3] in interest of Brewer, the merger between Brewer and IUH resulted in the merger *in fact* of Brewer and IU, a foreign corporation, requiring at least a 90% affirmative vote of the stockholders[4] in interest of Brewer.

Perl filed a motion for summary judgment to declare the merger invalid, or in the alternative, for a mandatory injunction requiring IU to rescind and set aside the merger between Brewer and IU.

The defendants filed a motion for partial summary judgment to declare the proxy statement accurate in its representation that the merger between IUH and Brewer required an affirmative vote of 75% of the outstanding shares of Brewer.

---

[3] HRS § 417-4 reads, in pertinent part, as follows:

Authorization of stockholders. Either before or after the approval of the proposed agreement by the board of directors, meetings of the stockholders of each constituent corporation shall be called, and at each meeting the proposed merger or consolidation agreement shall be considered. A written notice setting forth the time, place, and purpose of meeting, and either a copy of the proposed agreement or a statement of the general terms thereof, and stating the date on which the notice is mailed, shall be mailed, postage prepaid, at least thirty days prior to the date of the meeting, to every stockholder at his last known address appearing on the books of the corporation. Before any merger or consolidation agreement becomes effective, the agreement shall be approved or authorized by the vote of the holders of not less than three-fourths of all the issued and outstanding shares of stock having voting power, even though their right to vote is otherwise restricted or denied by the charter, articles, bylaws, or resolution of the constituent corporation.

[4] HRS § 417-16 read, in pertinent part, as follows:

Notwithstanding section 417-15, the merger or consolidation of any number of domestic corporations with any number of foreign corporations may be effected if the foreign corporations are authorized to effect such a merger or consolidation by the laws of the jurisdiction under which they are formed; provided, that if the surviving or consolidated corporation is a foreign corporation no merger or consolidation agreement shall be effected as to any domestic corporations unless the authorization and approval have been obtained from the holders of not less than nine-tenths of the issued and outstanding shares of each domestic corporation even though their right to vote is otherwise restricted or denied by the charter, articles, bylaws, or resolution of the domestic corporation.
Note current version of HRS § 417-16 (Supp. 1979).

On the limited legal issues raised by the parties, the trial court, in its decision and order, stated that:

What the Court is faced with in this case is not a clear-cut merger between two domestic corporations that requires 75% shareholder approval pursuant to H.R.S. § 417-4.

Nor is the Court faced with a clear-cut merger of a domestic corporation into a foreign corporation that requires the approval of 90% of the outstanding shares of the domestic corporation pursuant to H.R.S. § 417-16.

Instead, this case involves a so-called triangular merger between a domestic corporation and a wholly-owned domestic subsidiary of a foreign corporation, in which minority shareholders in the domestic corporation were forced to exchange their shares of stock in the domestic corporation for stock in the foreign corporation on a share-for-share basis.

Hence, the sole legal issue for the Court to decide is whether the approval of 75% or 90% of the outstanding shares of Brewer common stock is required for the series of transactions involving IU International Corporation, IU Investment Corporation, IUH Corporation, and C. Brewer and Company, Ltd. The decision depends on how this Court characterizes said series of transactions.

Considering the evidence and the inferences which can be fairly drawn from the evidence in the light most favorable to Defendants, the Court finds that for the purposes of determining whether a 75% or 90% approval is required a de facto merger occurred between C. Brewer and Company, Ltd., a Hawaii corporation, and IU International Corporation, a Maryland Corporation, in which the Maryland corporation survived and the Hawaii corporation became in effect a wholly-owned subsidiary of the Maryland corporation.

. . . .

The Court finds that IUH Corporation had a corporate existence of one year and two weeks, that IU International Corporation formed IUH Corporation for the sole

purpose of acquiring all the shares of Brewer's minority shareholders and that IUH Corporation acted as IU International Corporation's agent in doing so.

The Court finds that because of the purported merger of IUH Corporation, a Hawaii corporation, into C. Brewer and Company, Ltd., a Hawaii corporation, Brewer's minority shareholders ceased to own stock in a Hawaii corporation and instead became shareholders in IU International Corporation, a Maryland corporation.

The Court finds that in substance and in effect the purported merger was between a domestic corporation and a foreign corporation in which the foreign corporation survived, thus requiring the approval of 90% of the shares of the domestic corporation, H.R.S. § 417-16, rather than between two domestic corporations, which would require 75% approval, H.R.S. § 417-4.

. . . .

The Court has examined the second paragraph of § 417-3 and finds that the merger agreement between IUH Corporation and C. Brewer and Company, Ltd., is not in compliance with the terms of § 417-3 even if the Court construes the merger agreement as involving two domestic corporations as alleged by Defendants.

. . . .

The Court finds that there was no distribution of stock to Brewer shareholders in compliance with the second paragraph of § 417-3 but rather an exchange of stock which forced Brewer's minority shareholders to exchange their shares of Brewer stock on a share-for-share basis for IU International Corporation stock. . . .

The manner in which an "exchange of stock" in a proposed merger can be accomplished is controlled by the last phrase of the first paragraph of § 417-3: "and the manner and basis of converting the shares of each of the constituent corporations into shares of the surviving . . . corporation."

The merger proposal not only failed to meet the above requirement, but if we apply the factual situation to the above quoted portion of the law, the surviving corporation is in fact IU International and not C. Brewer.

.   .   .   .

THEREFORE, IT IS HEREBY ORDERED: (1) that Plaintiff's Motion for Summary Judgment shall be, and the same is hereby GRANTED; (2) that Defendants' Motion for Partial Summary Judgment shall be, and the same is hereby DENIED; (3) that Judgment be entered in accordance herewith.

IT IS HEREBY FURTHER ORDERED: (1) that pursuant to Hawaii Revised Statutes Sec. 641(b) [sic],[5] as amended, an appeal to the Supreme Court of Hawaii shall be permitted by this Court from this Decision and Order and the Judgment entered in accordance herewith. . . .

I.

We agree with appellants that HRS § 417-2[6] rather than HRS § 417-16[7] controls the merger in the instant case. Al-

---

[5] HRS § 641-1(b) provides that:

(b) Upon application made within the time provided by the rules of court, an appeal in a civil matter may be allowed by a circuit court in its discretion from an order denying a motion to dismiss or from any interlocutory judgment, order, or decree whenever the circuit court may think the same advisable for the speedy termination of litigation before it. The refusal of the circuit court to allow an appeal from an interlocutory judgment, order, or decree shall not be reviewable by any other court.

[6] HRS § 417-2 provides that:

Any two or more domestic corporations may be (1) merged into one of the domestic corporations, which is designated in this part as "the surviving corporation", or (2) consolidated into a new corporation to be formed under this part, which is designated in this chapter as "the consolidated corporation" by complying with sections 417-3 to 417-4.

[7] See note 4 supra.

though a "reverse triangular merger"[8] procedure was utilized to effectuate the merger between IUH and Brewer, neither our laws nor our corporate administrative regulations prohibit the use of such a procedure to merge a wholly-owned Hawaii subsidiary of a foreign corporation with a Hawaii corporation.

In our opinion the trial court erred in concluding that a de facto merger occurred between Brewer, a Hawaii corporation, and IU, a foreign corporation, with IU as the surviving corporation. The primary purpose of the de facto merger doctrine has been to afford dissenting shareholders rights of appraisal which would be available under a statutory merger but of which they have been deprived simply because the merger is called something else. *Williams v. Pennsylvania Co.*, 367 F.Supp. 1158, 1169 (E.D. Pa. 1973); *see generally* W. Fletcher, Cyclopedia of the Law of Private Corporations § 7045.1 (rev. perm. ed. 1973). Here, under the statutory merger of IUH and Brewer, appraisal rights were available to the dissenting stockholder.[9]

We also disagree with the trial court's determination that the merger agreement between IUH and Brewer was not in

---

[8] A triangular merger is so called because there are three corporations involved: a parent, its subsidiary and the company to be acquired. In a "reverse" triangular merger, the subsidiary is merged into the acquired company, the stock in the subsidiary held by the parent is exchanged for newly issued shares in the acquired company, and the shares of the acquired company held by its shareholders are exchanged (in the instant case, cancelled) for the stock of the parent which was the asset of the subsidiary. Thus, although the acquired corporation is the surviving corporation, immediately after the merger it is a wholly-owned subsidiary of the parent corporation. Ballantine & Sterling, California Corporation Laws § 252.03(4) (4th ed. 1979).

[9] Although this court is cognizant of cases which would extend application of the de facto merger doctrine to cover a broad spectrum of situations not involving the availability of appraisal rights, *see, e.g., Williams v. Pennsylvania Co., supra* at 1170; *Wilson v. Fare Well Corp.*, 140 N.J. Super. 476, 356 A.2d 458 (1976), in our opinion, the facts herein do not call for the application of said doctrine.

compliance with the terms of HRS § 417-3.[10] The "manner and basis of converting the shares" of IUH, a constituent corporation, "into shares of the surviving corporation," Brewer, was properly set forth in the subject merger agreement. *See* Article III(B) of the Merger Agreement. The mandatory provisions of HRS § 417-3, paragraph 1, were accordingly satisfied. We find, further, that where each Brewer share issued and outstanding immediately prior to the merger was cancelled and in lieu thereof a $1.36 share of IU convertible preferred stock was distributed, *see* Article III(C) of the Merger Agreement, that transaction constituted a

---

[10] HRS § 417-3 reads in pertinent part, as follows:

The board of directors of each constituent corporation shall prepare for consideration by the stockholders a proposed merger or consolidation agreement which shall set forth that the constituent corporations are to become a single new corporation, or that one or more of the constituent corporations are to be merged into a specified constituent corporation; the terms and conditions of the merger or consolidation and the mode of carrying the same into effect; the names and addresses of the first directors and officers of the surviving or consolidated corporation and their respective terms of office; the amount of the capital stock of the surviving or consolidated corporation, and if the privilege of subsequent extension of the capital stock is asked for, the limit of the extension; the preferences, voting powers, restrictions, and qualifications of all classes of stock of the surviving or consolidated corporation, if there is to be more than one class of stock; and the manner and basis of converting the shares of each of the constituent corporations into shares of the surviving or consolidated corporation.

The agreement may also provide for the distribution of cash or any other property, or assets of any constituent corporation, in whole or in part, in lieu of or partially in lieu of shares of the surviving or consolidated corporation to stockholders of the constituent corporations or any class of them; but nothing in this part shall be deemed to authorize the distribution of cash, or other property, or assets to the stockholders of any constituent corporation (except in payment of dissenting stockholders for their shares under sections 417-19 to 417-30) unless after giving effect to any such distribution of cash, or other property, or assets, the liabilities of the surviving or consolidated corporation, including those derived by it from the constituent corporations, plus the amount of the capital stock of the surviving or consolidated corporation do not exceed the value of the remaining assets and property of the surviving or consolidated corporation, and unless the liabilities of the surviving or consolidated corporation, including those derived by it from the constituent corporations, are less in amount than one-half the value of the remaining assets and property of the surviving or consolidated corporation.

Note current version of HRS § 417-16 (Supp. 1979).

discretionary distribution of "assets" permissible under HRS § 417-3, paragraph 2. We recognize no compelling authority to the contrary. Additionally, we find to be without merit Perl's contention that the IU stock had not attained status as IUH assets prior to distribution. *See* Article I § 1.02, and Article VI §§ 6.01 and 6.02, of the "Agreement".

We, thus, reverse the trial court and hold that the merger herein was a merger between IUH and Brewer, both Hawaii corporations, in accordance with the requisite statutory formalities, subject, however, to the rights and remedies of Perl as hereinafter discussed.

## II.

Appellants contend that the trial court erred in not dismissing the instant complaint for equitable relief on the ground that Perl's remedy is limited under HRS § 417-29 to an action to ascertain and receive the fair market value of her shares through statutory appraisal.

HRS § 417-29 provides in relevant part that:

> The rights and remedies of any stockholder to object to or litigate as to any such merger or consolidation are limited to the right to receive the fair market value of his shares in the manner and upon the terms and conditions provided in sections 417-19 to 417-30, except suits or actions to test the sufficiency or regularity of the votes of the stockholders authorizing or approving the proposed action of any constituent corporation.

In our opinion, the clause "actions to test the sufficiency or regularity of the votes of the stockholders" in HRS § 417-29 means actions to test whether the number of shares required to authorize or approve the proposed merger have been legally voted in favor of the proposed action of any constituent corporation. And such a test compels a resolve of the applicable standard to be met: the affirmative vote of the holders of not less than 75% of the issued and outstanding shares of each of the constituents in the merger of two domestic corporations, or not less than 90% of the shares of a domestic

corporation in the merger of a domestic corporation and a foreign corporation. This, however, does not resolve the issue of whether appraisal is the exclusive remedy available to Perl, and further, whether a claim to relief for breach of fiduciary duty lies herein.

The central question remaining in this case, then, is whether behavior short of fraud[11] is actionable where the controlling statute states that, except for an action testing the sufficiency or regularity of the vote, appraisal is the exclusive remedy of any stockholder objecting to a merger. We find recent Delaware caselaw instructive in this regard.

In *Singer v. Magnavox Co.*, 380 A.2d 969 (Del. 1977), North American Philips Corporation formed North American Philips Development Corporation (Development) to make a tender offer for shares of Magnavox Company (Magnavox). Through the tender offer, Development acquired approximately eighty-four percent of the Magnavox common stock; the remaining Magnavox shareholders were frozen out by the eventual merger of Magnavox with T.M.C. Development Corporation (T.M.C.), a corporation created by Development

---

[11] Even in states which by the terms of their statutes or by judicial interpretation have found appraisal an exclusive remedy, fraud is almost universally held to·be an independent ground for the exercise of equitable jurisdiction. *See, e.g., Robb v. Eastgate Hotel, Inc.*, 347 Ill. App. 261, 278, 106 N.E.2d 848, 855 (1952) ("Section 73 [the dissenters' rights statute] provides an adequate remedy where the dissenting stockholders' only complaint is the inadequacy of the price received and whose only claim is for money damages—the fair value of his shares. It is not a full and adequate remedy where fraud is charged. In such cases a court of equity may go beyond the mere assessment of damages and rescind the sale. . . . Fraud is an independent ground for the exercise of equitable jurisdiction."); *Willcox v. Stern*, 18 N.Y.2d 195, 204, 273 N.Y.S.2d 38, 45, 219 N.E.2d 401, 405 (1966); ([I]t has been a judicial principle that equity *will* act — despite the existence of an appraisal remedy — where there is fraud or illegality . . . and this principle was recently codified in . . . the Business Corporation Law."); *accord, Cole v. National Cash Credit Association*, 18 Del. Ch. 47, 156 A.183 (1931); *Teschner v. Chicago Title and Trust Co.*, 59 Ill. 452, 322 N.E.2d 54 (1974); *Joseph v. Wallace-Murray Corp.*, 354 Mass. 477, 238 N.E.2d 360 (1968); *Matteson v. Ziebarth*, 40 Wash.2d 286, 242 P.2d 1025 (1952). *But cf. Beechwood Securities Corp. v. Associated Oil Co.*, 104 F.2d 537, 540-41 (9th Cir. 1939) (noting that no cases hold that limitation of equitable relief to statutory appraisal is beyond power of the state).

Perl, however, did not claim fraud.

for that sole purpose. A dissenting shareholder brought suit, alleging, in part, that: (1) the merger was fraudulent in that it did not serve any business purpose other than the forced removal of public minority shareholders at a grossly inadequate price, and (2) in approving the merger, at a grossly inadequate cash price, defendants breached their fiduciary duties to the minority shareholders. Defendants moved to dismiss on the grounds that their actions were expressly authorized and in compliance with the Delaware merger statute, and that the exclusive remedy for dissatisfaction with the merger was an appraisal under 8 Del. Code § 262; the motion was granted. On appeal, the Delaware Supreme Court acknowledged that there was "both statutory authorization for the Magnavox merger and compliance with the procedural requirements," but noted that "it does not necessarily follow that the merger is legally unassailable." *Id*. at 975. Although the Delaware appraisal statute had previously been interpreted to be a dissenting stockholder's exclusive remedy, the Supreme Court of Delaware accordingly held that

> a Delaware Court will not be indifferent to the purpose of a merger when a freeze-out of minority stockholders on a cash-out basis is alleged to be its sole purpose. In such a situation, if it is alleged that the purpose is improper because of the fiduciary obligation owed to the minority, the Court is duty-bound to closely examine that allegation even when all of the relevant statutory formalities have been satisfied.

*Id*. at 979. The *Singer* court distinguished cases which had refused to enjoin freeze-out mergers by stating that "none of these decisions involved a merger in which the minority was totally expelled *via* a straight 'cash-for-stock' conversion in which the only purpose of the merger was, as alleged here, to eliminate the minority." *Id*. at 978. Although the court concluded that a merger accomplished "without any purpose other than elimination of the minority stockholders" was "violative of the fiduciary duty owed by the majority to the minority stockholders," *id*. at 980, the court left for *Tanzer v*.

*International General Industries, Inc.*, 379 A.2d 1121 (Del. 1977), decided a month later, discussion of what would constitute such a "proper business purpose."

In *Tanzer*, IGI, which owned 81 percent of the stock of Kliklok Corporation (Kliklok), formed KLK Corporation (KLK) as part of a plan by which IGI would acquire by merger all of Kliklok's stock. Minority shareholders of Kliklok brought suit for injunctive relief on the ground that the sole purpose of the merger was to serve an interest of the parent. The Court of Chancery refused to grant a preliminary injunction. The Delaware Supreme Court affirmed, finding that a parent corporation, as majority stockholder, "had a right to look to its own corporate concerns in determining how to conduct the [subsidiary's] affairs, including a decision to cause it to merge." *Id.* at 1124. Although the court warned that the interest of the parent "must not be suspect as a subterfuge, the real purpose of which is to rid itself of unwanted minority shareholders in the subsidiary," *id.*, the court found that a merger accomplished to convey an economic benefit to the parent corporation by facilitating long-term debt financing sufficed to meet the standard of fiduciary conduct erected in *Singer*. The court noted, however, that bona fide purpose notwithstanding, a dominant corporation sitting on both sides of a transaction "must be prepared to show that it has met its duty . . . of 'entire fairness' to the minority." *Id.*

We find Delaware caselaw most persuasive. We agree that a merger effected for the sole purpose of freezing out the minority interest is a violation of fiduciary principles governing the relationship between controlling and minority shareholders. We conclude that appraisal is not the exclusive remedy available to Perl if the above violation is established.[12]

---

[12] Appellants contend that California law provides persuasive precedent for finding appraisal the sole remedy of a stockholder objecting to a merger. In our opinion, appellants' contention is ill-founded.

We note that although appellants argue that the California appraisal statute bears substantial similarity to the Hawaii statute, the California statute, Cal. Corp. Code §

*Perl* is arguably distinguishable from the Delaware cases, however, in the following respect: by the terms of the subject "Agreement", all existing stock in Brewer were to be cancelled for redeemable, convertible, preferred shares in the

---

1312, appears distinguishable in at least one significant respect. Cal. Corp. Code § 1312(a) states that: -- --

> No shareholder of a corporation who has a right under this chapter to demand payment of cash for the shares held by the shareholder shall have any right *at law or in equity* to attack the validity of the reorganization or short-form merger, or to have the reorganization or short-form merger *set aside or rescinded,* except in an action to test whether the number of shares required to authorize or approve the reorganization have been legally voted in favor thereof. . . .

(Emphasis added.) *Cf.* Cal. Corp. Code Sec. 1312(b) (providing that where one party to a short-form merger or reorganization is either directly or indirectly controlled by another party to the merger, the appraisal remedy of Section 1312(a) shall not be the exclusive remedy). Under HRS § 417-29, equitable remedies have not been specifically extinguished and may accordingly be considered to remain undisplaced. *But cf.* In re Jones & Laughlin Steel Corp., _____ Pa. Super. Ct. _____, 398 A.2d 186 (1979) (contra reading of the Pennsylvania appraisal statute).

Furthermore, in Jones v. H. F. Ahmanson & Co., 1 Cal.3d 93, 460 P.2d 464, 81 Cal. Rptr. 592 (1969), the Supreme Court of California, noting that the traditional rules of fiduciary obligation "failed to afford adequate protection to minority shareholders," *id.* at 111, 460 P.2d at 473, 81 Cal. Rptr. at 601, decided to impose upon controlling shareholders a "comprehensive rule of good faith and inherent fairness to the minority in any transaction where control of the corporation is material." *Id.* at 112, 460 P.2d at 474, 81 Cal. Rptr. at 602; *see generally* F. O'Neal, "Squeeze-Outs" of Minority Shareholders § 7.13 (1975) (hereinafter cited as O'Neal).

Defendants in *Ahmanson* had taken the position that as shareholders they owed no fiduciary obligation to other shareholders, absent reliance on inside information, use of corporate assets, or fraud. The California Supreme Court disagreed:

> Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority. Any use to which they put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business.

*Id.* at 108, 460 P.2d at 471, 81 Cal. Rptr. at 599. The court cited Remillard Brick Co. v. Remillard-Dandini, 109 Cal. App.2d 405, 241 P.2d 66 (1954), as authority for the proposition "that the fiduciary obligations of directors and shareholders are neither limited to specific statutory duties and avoidance of fraudulent practices nor are they owed solely to the corporation to the exclusion of other shareholders." 1 Cal.3d at 109, 460 P.2d at 472, 81 Cal. Rptr. at 600. Although *Ahmanson* did not involve a merger, it appears clear from the language of the opinion that the California Supreme Court would apply the fiduciary duty of good faith and inherent fairness to such a situation. O'Neal, *supra* at § 5.13 n. 29 (Cum. Supp. 1979).

parent IU;[13] the Brewer minority was not literally "cashed" out.[14]

It makes little sense, however, to condemn cash out mergers on the one hand, and yet to permit mergers using preferred securities redeemable at the option of the majority on the other if the minority may be just as effectively eliminated from the corporation by the redemption of the stock as by the straight cash out method. *See* O'Neal, *supra* note 12, at §§ 5.12 and 5.13.

In the instant case were it not for the fact that the merger documents also provide that the minority stockholders have

---

[13] Annex 2 to the "Agreement,"*see* note 1*supra* and corresponding text, provides *inter alia* that the $1.36 Preferred IU stock would be redeemable by the Corporation upon a set redemption price schedule. A holder of stock called for redemption could convert to common stock until the "close of business on the business day next preceding the redemption date." Notice of redemption would "be mailed by the Corporation not less than 30 nor more than 60 days prior to the date fixed by the Board of Directors of the Corporation for redemption."

[14] At least one commentator has argued that a freeze-out would not occur where the property allowed as consideration in a merger "consists of equity securities issued by a parent of one of the constituent corporations and the recipient stockholders will thus continue to have an indirect investment interest in the business of the constituents." Fillman, *Cash and Property as Consideration in a Merger or Consolidation*, 62 Nw. U. L. Rev. 837, 859 (1968). Indeed, it has been stated that "[t]here is respectable authority to support a merger plan which gives to minority shareholders in a merging corporation only redeemable preferred stock in the resulting corporation." O'Neal & Derwin, Expulsion or Oppression of Business Associates 78 (1961) (discussing*Matteson v. Ziebarth, supra)*, quoted by Vorenberg, *Exclusiveness of the Dissenting Stockholder's Appraisal Right*, 77 Harv. L. Rev. 1187, 1196 n. 23 (1964).

In contrast, it was held in *Outwater v. Public Service Corp.*, 103 N.J. Eq. 461, 465, 143 A. 729, 731 (Ch. 1928), *aff'd* 104 N.J. Eq. 490, 146 A. 916 (N.J. 1929), that "in addition to fair exchange values, exchange for relative equality of securities in the merged company is implied in all mergers, and relative permanency is a vital element of the securities." The court, noting that the preferred stock of the consolidated company was redeemable within three years at the option of the parent corporation, concluded that "the merger, in effect, is nothing less than a forced sale by the majority stockholders to itself at a price fixed by it and payable at its pleasure."*Id.* at 466, 143 A. at 731.

*Outwater* has been criticized as being grounded in "the now dated concept of vested shareholder's rights, which recognized the shareholder's continuing property interest in the corporation." Note, *Delaware Reexamines its Merger Laws: New Protection for Minority Shareholders?*, 6 Hofstra L. Rev. 973, 986 (1978).

the option to convert their preferred stock to common stock of the parent corporation, at specifically designated conversion rates, we would be constrained to find the merger invalid.

In our opinion, however, the critical issue herein centers on the effect of the redeemability of the preferred stock. On remand, a determination should accordingly be made as to whether the documents creating the $1.36 IU redeemable, convertible preferred stock result in a situation tantamount to a *Singer* cash out, and further, whether the merger was effected for the sole purpose of freezing out the minority interest.

We, therefore, remand the case for further proceedings in accordance with this opinion. In the event the instant situation is determined to be tantamount to a *Singer* cash out, and proof had that the merger was effected for the sole purpose of freezing out the minority interest, the IUH-Brewer merger shall be set aside, notwithstanding the fact that the merger has met the requisite statutory formalities.

*Rodney N. Fujiyama (Wallace S. Fujiyama* on the briefs; *Fujiyama, Duffy & Fujiyama* of counsel) for defendants-appellants.

*Sidney Silverman (Silverman & Harnes* and *Bernstein & Obstfeld, P. C.* of counsel; *Emmet White* on the brief, *Mau, White & Yee* of counsel) for plaintiffs-appellees.

*Chun, Kerr & Dodd* for defendant-appellant, The First Boston Corporation.