USX CORPORATION, Plaintiff-Appellant, v. JESSE WHITE, as Illinois Secretary of State, Defendant-Appellee.

First District (1st Division)   No. 1—00—3333

Opinion filed March 1, 2004.

Rooks, Pitts & Poust, of Chicago (Jay A. Lipe, Lee T. Hettinger, and Nick Marsico, of counsel), for appellant.

Brown, Hay & Stephens, of Springfield (Donald R. Tracy, of counsel), for appellee.

JUSTICE McBRIDE delivered the opinion of the court:

Plaintiff-appellant, USX Corporation (USX), appeals from an administrative decision rendered by defendant-appellee, Jesse White, as Illinois Secretary of State (Secretary), in which the Secretary denied certain statements of correction and petitions for refund of franchise taxes filed by USX in connection with a merger that occurred on February 11, 1986. USX sought review in the trial court. The trial court affirmed the Secretary's decision on the basis that the merger did not amount to a statutory merger for franchise tax purposes under

the Illinois Business Corporation Act of 1983 (Act) (805 ILCS 5/15.70 (West 2000)). USX appeals.

We state the following background facts before addressing the issues raised by this appeal. In 1986, USX, a Delaware corporation, sought to acquire 100% stock ownership of Texas Oil and Gas Corporation (TXO), also a Delaware corporation. USX accomplished this combination by way of a reverse triangular merger[1] transaction. To do so, USX created a wholly owned, limited-purpose subsidiary, XCO Subsidiary Corp. (XCO), also a Delaware corporation. On October 26, 1985, USX contributed $100 to XCO in exchange for 100 shares of XCO common stock. On October 29, 1985, USX, TXO, and XCO, entered into an "Amended and Restated Agreement and Plan of Merger" (Agreement). The Agreement began by stating the following:

"AGREEMENT AND PLAN OF MERGER, dated as of October 29, 1985 (the 'Agreement'), as amended on December 12, 1985, among United States Steel Corporation, a Delaware corporation ('Parent'), XCO Subsidiary Corp., A Delaware corporation and a wholly owned subsidiary of Parent ('Sub'), and Texas Oil & Gas Corp., a Delaware corporation (the 'Company').

WHEREAS, to induce Parent and Sub to enter into this Agreement and upon their request as a condition to their willingness to enter into this Agreement, the Company has entered into a Purchase Option Agreement (the 'Purchase Option Agreement') and a Stock Option Agreement (the 'Stock Option Agreement') of even date herewith Parent; and

WHEREAS, Parent and certain shareholders of the Company have entered into a Shareholder Agreement of even date herewith (the 'Shareholder Agreement');

NOW, THEREFORE, the parties agree to as follows:

ARTICLE 1

THE MERGER

SECTION 1.1 *Surviving Corporation*

(a) at the Effective Time (as defined in Section 1.2) and in accordance with the provisions of the Agreement and the Delaware

---

[1]"In a 'reverse' triangular merger, the subsidiary is merged into the acquired company, the stock in the subsidiary held by the parent is exchanged for newly issued shares in the acquired company, and the shares of the acquired company held by its shareholders are exchanged *** for the stock of the parent which was the asset of the subsidiary. Thus, although the acquired corporation is the surviving corporation, immediately after the merger it is a wholly-owned subsidiary of the parent corporation." *Perl v. IU International Corp.*, 61 Haw. 622, 635 n.8, 607 P.2d 1036, 1043 n.8 (1980), quoting H. Ballantine & G. Sterling, California Corporation Laws § 252.03(4) (4th ed. 1979).

General corporation Law (the 'Delaware Law'), Sub shall be merged with and into the Company (the 'Merger'), which shall be the surviving corporation (hereinafter sometimes called the 'Surviving Corporation') and which shall continue its corporate existence under the laws of the State of Delaware."

Under the Agreement, the USX board of directors created an exchange ratio in which each TXO shareholder received a .6333 share of newly issued USX stock in exchange for each share of TXO stock. The stockholders of both USX and TXO approved the Agreement. As a result, the TXO shareholders surrendered 210,302,337 shares of TXO stock which were converted into 133,184,470 newly issued shares of USX stock. The shareholders of TXO received this newly issued USX stock in exchange for relinquishing ownership of TXO. In addition, each share of XCO stock held by USX was converted into one share of TXO stock. In total, USX's 100 shares of XCO stock were converted into 100 shares of TXO stock and XCO merged into TXO with TXO surviving the merger.

As a result of these transactions, USX owned 100 shares of TXO stock, representing 100% ownership of TXO, making TXO a wholly owned subsidiary of USX. XCO, which had merged into TXO, disappeared.

On February 11, 1986, a certificate of merger was filed by TXO through its president and chief executive officer, Forrest Hoglund, under section 251(c) of the General Corporation Law of Delaware. Del. Code Ann. tit. 8, § 251(c) (2001). The certificate identified the merging parties as XCO and TXO, and named TXO the surviving corporation. On September 18, 1986, USX filed a report of issuance of shares and increases in paid-in capital pursuant to section 14.20 of the Act. 805 ILCS 5/14.20 (West 2000).

■ Section 14.20 governs reports of issuance of shares and increases in paid-in capital. Section 14.20(a) of the Act provides, in relevant part:

"[E]ach foreign corporation authorized to transact business in this State, after: the issuance of any share not previously reported to the Secretary of State as having been issued; *** shall execute *** a report setting forth [several enumerated requirements.]" 805 ILCS 5/14.20(a) (West 2000).

In its section 14.20 report, USX reported $2,996,501,446 ($2.9 billion) as the entire consideration received for issuing the 133 million shares of new USX stock. During the period September 1986 through September 1991, USX filed approximately 50 paid-in-capital reports with the Secretary all restating the $2.9 billion paid-in-capital figure that was reported in the September 18, 1986, section 14.20 report.

In 1991, TXO merged vertically[2] into USX. This merger resulted in an internal review of certain financial documents, including the form filed under section 14.20 on September 18, 1986. From this review, USX determined that a mistake had been made, that the reported consideration of $2.9 billion was an "overstatement," and that TXO's historical paid-in-capital figure of $816,541,000 should have been used instead. In a letter to Secretary White dated August 17, 1992, USX sought to correct its paid-in-capital amounts filed under the Act for the period August 1986 through May 1991, on the basis that USX "overstated" its paid-in capital in the amount of $2,130,165,399 following the merger transaction in 1986. 805 ILCS 5/14.20, 14.25 (West 2000). USX explained that the "overstatement" resulted from an incorrect valuation of its investment in TXO. The USX petitions for refund sought reimbursement of franchise taxes that were overpaid by USX as a result of the "overstated" paid-in capital.

In a letter dated October 2, 1992, the Secretary rejected USX's statements of correction and petitions for refund. Specifically, the Secretary stated that "the enclosed statements of correction cannot be accepted inasmuch as USX Corporation was not directly a party to the merger occurring between its subsidiary and [TXO], the pooling-of-interest method of accounting[3] does not apply." In response, USX requested a formal administrative hearing in a letter dated November

---

[2]A vertical merger is defined as "[a] merger between businesses occupying different levels of operation for the same product, such as between a manufacturer and a retailer, a merger of buyer and seller." Black's Law Dictionary 1003 (7th ed. 1999).

[3]As noted by the trial court, the accounting treatment after a business combination is largely governed by Accounting Principles Board Opinion No. 16 (APB 16). Under APB 16, a merger is either reported by the purchase method of accounting or pooling-of-interest method of accounting. The record indicates that the purchase method is applied to a business combination where one company purchases or buys out the other company. On the other hand, the pooling-of-interest method is applied where there is an agreement between the shareholder groups of two companies to combine their respective shareholder interests to form one group of shareholder interests. The pooling-of-interest method is employed only if certain stringent conditions are met, and in effect, it treats the merger as if the two companies were really one company from the day they started in business. There is no newly invested capital as part of the merger transaction, no capital is raised, and no capital is distributed. Instead, the capital accounts of the two corporations are aggregated or combined and reported on the books at that value. The record shows that the pooling-of-interest method and the "aggregation rule" are synonymous.

30, 1992, where it sought a review of the valuation of its total paid-in capital used in the calculation of its Illinois annual franchise tax liability and license fees for the fiscal years which ended September 30, 1989, through September 30, 1992.

At the hearing, John Surma, a partner at Price Waterhouse, testified that he was assigned to serve USX at the time of the merger transaction at issue. He said that he was involved in the transaction and that it was the expectation of the parties that the pooling-of-interest method was to be applied to the "all stock" merger transaction between USX and TXO. As one of the conditions of the merger agreement, Price Waterhouse was hired to render an opinion as to whether the pooling-of-interest method would be appropriate for the proposed transaction.

Surma said that the pooling-of-interest method is only appropriate when the merger is an all-stock transaction, "essentially resting on the theory that the corporations themselves have not expended or received any consideration." According to Surma, three factors have to be considered for the pooling-of-interest method to apply: (1) the attributes of both combining companies; (2) the manner of the combination; and (3) the absence of planned transactions in the immediate future.

Surma said that USX was a party to the merger from his perspective. Based on an analysis of the factors noted above, he also stated that it was the conclusion of Price Waterhouse that the pooling-of-interest method applied to the 1986 merger transaction.

James Murphy, a USX attorney assigned to work on the merger at issue, testified that TXO was a "survivor" in the reverse triangular merger among USX, XCO, and TXO. He said that it was necessary for TXO be a survivor to the merger because TXO had a number of financing documents that contained various covenants that would have been problematic for USX had the companies merged horizontally,[4] in effect rendering USX the sole survivor to the merger. Murphy also testified that a desire existed to retain the TXO name and reputation in the state where it operated.

Albert Adkins, director of consolidated income taxes at USX, testified that, based upon the report rendered by Price Waterhouse, the USX-TXO transaction met all the requirements of the pooling-of-interest method of accounting. He also concluded that USX was a

---

[4]A horizontal merger is "[a] merger between two or more businesses that are on the same market level because they manufacture similar products in the same geographic region; a merger of direct competitors." Black's Law Dictionary 1003 (7th ed. 1999).

party to the merger from an accounting perspective and that USX was also considered a surviving party to the merger transaction. However, he provided no basis for his opinion.

Ariadne Beldecos, a USX tax attorney, testified that she was responsible for preparing Illinois state franchise tax returns at the time of the 1986 merger. When USX and TXO merged in 1991, she noticed an adjustment of $2.1 billion made on the common stock transaction report. She said that a correction "had to be made" to reflect the actual capital that was required to be recorded, which was $816 million. It was this adjustment to the paid-in capital reported that USX sought to correct in the statements of correction as indicated by a letter Beldecos wrote to the Secretary on August 17, 1992.

Beldecos stated that the Secretary rejected approximately 50 corrections forms and refund claims. She then wrote to the Secretary requesting a formal hearing concerning the rejection. On cross-examination, she characterized the 1986 merger transaction as a "three-party merger."

Stephen Bigler testified that he is an attorney employed by a Delaware law firm which has expertise in matters related to general Delaware corporation law and mergers and acquisitions. His practice includes the interpretation of Delaware law as it relates to mergers and acquisitions and he is an expert in the area. Bigler stated that he was contacted to give an opinion as to whether a parent corporation in a triangular merger is a party to a statutory merger under a non-Delaware statute. He stated that he was given documents to learn more about the background of the transaction. After reviewing the transaction, Bigler concluded that the 1986 reverse triangular merger was a statutory merger under section 251 of the Delaware General Corporation Law. He stated there were two reasons for his conclusion; his firm's experience in the field of mergers and acquisitions, and the generally accepted view of what a reverse triangular merger is. He also said that USX was a party to the statutory merger because the merger "would not have happened without USX." He further concluded that USX was a surviving corporation because it was the parent corporation.

On cross-examination, Bigler admitted that the merger agreement itself defined the surviving corporation as TXO. He also said that he had not seen any document that referred to USX as the surviving corporation to the 1986 merger transaction. Bigler agreed that the ultimate issue in this case was a question of Illinois franchise tax law. He recognized that the Illinois franchise tax law differed from Delaware franchise tax law because the Illinois franchise tax is based on paid-in capital as defined by Illinois tax law.

Thomas Lys, a professor at the J.L. Kellogg Graduate School of Management at Northwestern University, testified that, under certain stringent requirements, companies must use the pooling-of-interest method of consolidating acquisitions to report to the Securities and Exchange Commission. If a company qualifies for use of this method, it is required to do so. Lys said that the pooling-of-interest method applied to reverse triangular mergers, and that USX was correct to use it as the proper method of accounting for the merger transaction at issue. In his opinion, the correct amount of the increase in paid-in capital was $860 million. Beldecos stated that the correct amount of paid-in capital to be reported was $816 million.

Lys also testified that USX was a party to the merger. He based his opinion on the facts that the stock involved was USX stock, the decision makers were the USX board, and, after the transaction, USX had total control of all of the assets of TXO.

Finally, in Lys's report, submitted in connection with the hearing, he stated that "[a] search found nine [other] corporations executing business combinations via triangular mergers, doing business in the State of Illinois, and qualifying for the [pooling-of-interest] method in the period 1988-1991."

Gene Petersen, an Illinois corporate attorney, testified that a "statutory merger" was not defined in the Act. He further said that, "if two corporations are to merge and neither of them is an Illinois corporation, they must merge pursuant to the law of the State where they were organized" under section 13.35 of the Act. Petersen opined that the 1986 merger was a merger under Delaware law.

He also said that USX was an essential party to the transaction. USX was essential because it was a party to the merger agreement and because it agreed to issue its shares as the consideration in exchange for the TXO shares.

Petersen also testified that the pooling-of-interest method applied to this transaction and that section 15.70 of the Act, which governs the basis for computation of franchise taxes payable by foreign corporations, was unclear.

Petersen acknowledged that the language in section 15.70(c) required a single surviving corporation after a merger. In a three-party merger, however, as he described the merger in this case, two surviving corporations existed, and the statute had to be construed "to fit that situation." According to Petersen, USX was one of the surviving companies. He also said that a reverse triangular merger was a statutory merger under section 251 of the Delaware General Corporation Law, and that such a merger was also treated as a statutory merger from a federal income tax standpoint. Like many of USX's

witnesses, Petersen never cited any authority for the proposition that a reverse triangular merger was a statutory merger under the Delaware General Corporation Law.

From a business practice perspective, Petersen stated that the 1986 merger was a statutory merger and that USX was a party to it. Finally, he stated that section 15.70 of the Act "was never updated" to include the ability of the corporation to use parent securities (as in a reverse triangular merger).

Larry Lash, manager of state income and franchise taxes for USX corporation, testified, without giving any basis, that USX and TXO "were part of that merger in 1986."

James Adler, the Secretary's accounting expert, testified that APB 16 concerns itself with two different accounting methods, the pooling-of-interest method and the purchase method, how to use them, and under what circumstance each method applies. As we pointed out earlier, APB 16 provides that a merger is either reported by the purchase method of accounting or by the pooling-of-interest method of accounting. Adler explained that the pooling-of-interest method is accounting for two companies that engage in a business combination as if the two companies were a single corporation from the day they started in business. The pooling-of-interest method is based on the book value of the company and not market value. Adler said that the pooling-of-interest method deliberately suppresses fair market values and, for that reason, did not reflect economic reality. He also stated that the term "value" in accounting normally means fair market value. He also explained that in accounting, the value of consideration received was fair market value. Adler stated that book value is an accounting concept that reflects the stated value of assets less the stated value of liabilities. On the other hand, fair market value is measured externally by examining the company's value in the marketplace. He further said that historical paid-in capital was considered a component of a company's book value.

Tim Antonacchi, a corporations specialist employed by the Secretary, testified that he reviewed UXS's statement of correction and rejected it. Specifically, he said that the pooling-of-interest method of accounting did not apply to the transaction as indicated in his letter to USX dated October 2, 1992. He further stated that if TXO had merged directly into USX by way of a horizontal merger, the "aggregation rule," or the pooling-of-interest method, would have applied.

Helen Conlee, employed by the Secretary in the department of business services, testified that she took over for Antonacci when he left the department in July of 1994. Specifically, she took over the files of eight corporations, none of which were USX, where "misreporting"

of paid-in capital on Act form 14.20 reports may have existed. These companies were involved in triangular mergers and some of these transactions had involved the pooling-of-interest method of accounting. They were also a part of Lys's report, referred to above, where Lys concluded that these companies had engaged in triangular mergers, did business in the State of Illinois, and qualified for the pooling-of-interest method. Conlee said that part of her responsibilities was to determine whether there had been misreporting of paid-in capital by these companies.

In a letter to one of these companies submitted as an exhibit by USX, Conlee wrote that, in "response to [the Secretary's] Interrogatories *** you [the corporation] have stated that the consideration received by you for issuance of certain shares in connection with an acquisition was reported pursuant to pooling-of-interest accounting as opposed to current value." Conlee also wrote that, under the Act, "whenever shares are issued for consideration other than cash, the value of the other consideration *** shall be reported, as opposed to historical paid-in capital." She further indicated in the letter that, "[u]sually, when stock is issued for stock of another corporation, the fair market value of the acquired stock would be reported as the consideration received."

John Cobb, an Illinois attorney and expert on Illinois franchise tax, testified that USX did not merge with TXO in 1986. Cobb also said that USX was neither a party nor a survivor to the merger between XCO and TXO in 1986. He added that USX was not the survivor to the merger because the "statute does not provide for USX to be a survivor." He also said that section 15.70 provided that a triangular merger is to be treated differently than a statutory merger.

Cobb testified that if USX had acquired TXO by way of a horizontal merger, as opposed to a reverse triangular merger, it would have achieved the desired tax result. He also said that if USX had merged with TXO in 1986, a report following merger "would have been" filed under section 14.25 of the Act. After reviewing the documents in this case, Cobb said that no such report was filed.

Additionally, Cobb noted that there was no certificate of merger indicating that USX and TXO merged in 1986. The absence of a certificate of merger, according to Cobb, indicated that USX and TXO did not merge in 1986. By contrast, he stated that he did see a certificate of merger between XCO and TXO. Cobb also testified that the Secretary's rejection of USX's statements of correction and petitions for refund was proper. Finally, he reiterated that, if USX had directly merged with TXO, it would have achieved the desired tax result.

Dale Reynolds, an employee of the Secretary, testified that there were no certified articles of merger between USX and TXO filed with the Secretary's department of business services in 1986. He further stated that there was no report following merger filed by USX reporting on a merger with TXO in 1986.

At the administrative hearing, the hearing officer, Mark C. Loro, stated:

"[I]n order to qualify for the computation of its paid-in capital according to the exception provided in the third paragraph of section 15.70, a corporation doing business in Illinois must satisfy two (2) requirements: (1) it must be a party to a 'statutory merger' and (2) it must be the surviving corporation in the merger."

See 805 ILCS 5/15.70(c) (West 2000). The hearing officer found that USX was a party to the Agreement, but that the Act permitted only one survivor to the merger (in this case TXO), and that the "exception" provided in section 15.70 of the Act excluded reverse triangular mergers. The hearing officer further rejected USX's constitutional arguments citing a sufficient difference between horizontal mergers and reverse triangular mergers to justify different tax treatment.

After the hearing, the Secretary affirmed the denial of USX's statements of correction and petitions for refund. USX appealed the Secretary's decision to the trial court. In a 68-page decision, the trial court affirmed the Secretary's decision finding that "there is a real and substantial difference between a statutory merger which leaves one survivor and a combination which leaves two or more." In making its decision, the trial court relied on sections 11.05(a), 11.50, 14.25(a), and 15.70 of the Act, all of which use the language "the surviving corporation" after a merger has occurred. The trial court reasoned that the repeated coupling of the term "statutory merger" with the singular term "surviving corporation" was an "unmistakable indication" that equivalent treatment was not intended for mergers leaving more than one surviving corporation. As a result, the trial court held that the merger at issue was not a statutory merger and that the pooling-of-interest or aggregation method did not apply to the transaction.

The trial court rejected the constitutional claims made by USX on the basis that the difference between a statutory merger and the merger transaction at issue was "grossly apparent." Specifically, the trial court noted that in a horizontal merger, the sole surviving corporation assumes all the debts and liabilities of merging corporations, while in a merger where a corporation acquires a subsidiary like TXO, both corporations survive and there is no assumption of debts and liabilities. Finally, the trial court found that, "since USX sought

to correct its previously filed [section] 14.20 reports in this proceeding, and aggregation is not available under that section, the Secretary properly denied its request."

We examine the following issues on appeal. First, whether, for purposes of determining franchise taxes, the 1986 merger transaction was a "statutory merger" and whether USX was "the surviving corporation" under section 15.70(c) of the Act. 805 ILCS 5/15.70(c) (West 2000). Second, whether the Secretary properly determined that the paid-in capital for the merger transaction was the fair market value of the TXO shares at the time of its combination with XCO. Third, whether, for purposes of determining franchise taxes, the Secretary's failure to apply the aggregation rule to USX's reverse triangular merger was a denial of equal protection and a violation of the uniformity clause under the United States and Illinois Constitutions. Fourth, whether the Secretary's decision was void under section 10—45 of the Illinois Administrative Procedure Act (5 ILCS 100/ 10—45 (West 2000)) because USX was not allowed to review the proposed decision of the hearing officer.

As a general rule, " '[t]axing statutes are to be strictly construed. Their language is not to be extended or enlarged by implication, beyond its clear import. In cases of doubt they are construed most strongly against the government and in favor of the taxpayer.' " *Van's Material Co., Inc. v. Department of Revenue*, 131 Ill. 2d 196, 202, 545 N.E.2d 695 (1989). "The burden is on the party seeking tax exemption, and all debatable questions are resolved in favor of taxation." *Yale Club of Chicago v. Department of Revenue*, 214 Ill. App. 3d 468, 472, 574 N.E.2d 31 (1991).

With regard to principles of statutory construction, we note:

"The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature. [Citations.] The best evidence of legislative intent is the language employed in the statute itself, which must be given its plain and ordinary meaning. [Citations.] The statute should be construed as a whole, with each section read in conjunction with every other section. [Citations.] A court is not permitted to ignore the plain meaning of the statute by reading into it exceptions, limitations, or conditions that the legislature did not express. [Citations.] Where the statutory language is clear and unambiguous, a court must give it effect without resort to other aids of construction. [Citations.]" *Forest Preserve District of Du Page County v. Brown Family Trust*, 323 Ill. App. 3d 686, 692, 753 N.E.2d 1110 (2001).

We also note that generally "courts will give substantial weight and deference to an interpretation of an ambiguous statute by the

agency charged with the administration and enforcement of that statute. [Citation.]" *Automatic Data Processing, Inc. v. Department of Revenue*, 313 Ill. App. 3d 433, 443-44, 729 N.E.2d 897 (2000). This deference is based on the agency's experience and expertise. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 394, 763 N.E.2d 272 (2002).

■ Material to our disposition are the following statutes. Section 15.65(d) of the Act requires foreign corporations transacting business in Illinois to pay certain franchise taxes. 805 ILCS 5/15.65(d) (West 2000). The amount of these franchise taxes is determined by the foreign corporation's paid-in capital. 805 ILCS 5/15.70(a) (West 2000). Section 1.80(j) of the Act, in relevant part, defines paid-in capital as:

"[T]he sum of the cash and other consideration received, less expenses, including commissions, paid or incurred by the corporation, in connection with the issuance of shares, plus any cash and other consideration contributed to the corporation by or on behalf of its share-holders plus amounts added or transferred to paid-in capital by action of the board of directors or shareholders pursuant to a share dividend, share split, or otherwise, minus reductions as provided elsewhere in this Act." 805 ILCS 5/1.80(j) (West 2000).

■ Sections 15.70(a) and (c) of the Act state, in relevant part:

"Basis for computation of franchise taxes payable by foreign corporations.

(a) The basis for the initial franchise tax payable by a foreign corporation shall be the amount represented in this State, determined in accordance with the provisions of this Section, of its paid-in capital as disclosed by its application for a certificate of authority to transact business in this State.

***

(c) Whenever a foreign corporation shall be a party to a statutory merger and shall be the surviving corporation, the basis for an additional franchise tax shall be the increased amount represented in this State, determined in accordance with the provisions of this Section, of the paid-in capital of the surviving corporation immediately after the merger over the aggregate of the amounts represented in this State of the paid-in capital of the merged corporations ***." 805 ILCS 5/15.70(a), (c) (West 2000).

Section 13.35 of the Act states, in relevant part:

"Merger of a foreign corporation authorized to transact business in this state. Whenever a foreign corporation authorized to transact business in this State shall be a party to a statutory merger permitted by the laws of the state or country under which it is organized, and such corporation shall be the surviving corporation, it shall forthwith file with the Secretary of State a copy of the articles of

merger duly authenticated by the proper officer of the state or country under the laws of which such statutory merger was effected ***." 805 ILCS 5/13.35 (West 2000).

Section 251(a) of the Delaware General Corporation Law states, in pertinent part:

"(a) Any 2 or more entities existing under the laws of this State may merge into a single corporation, which may be any 1 of the constituent entities or may consolidate into a new corporation formed by the consolidation, pursuant to an agreement or merger or consolidation, as the case may be, complying and approved in accordance with this section." Del. Code Ann. tit. 8, § 251(a) (2001).

Section 251(c) of the same statute states that, "[i]n lieu of filing the agreement of merger or consolidation required by this Section, the surviving or resulting corporation may file a certificate of merger or consolidation executed in accordance with § 103 of this title." Del. Code Ann. tit. 8, § 251(c) (2001).

As observed by the hearing officer in this case, in order for a foreign corporation doing business in Illinois to qualify for the computation of its paid-in capital according to the exception provided in section 15.70(c), two requirements must be satisfied: (1) it must be a party to a statutory merger and (2) it must be the surviving corporation in the merger. 805 ILCS 5/15.70(c) (West 2000). Additionally, USX had the burden of proving that it qualified for the exception under section 15.70(c), and "all debatable questions [will be] resolved in favor of taxation." *Yale Club of Chicago*, 214 Ill. App. 3d at 472.

The first requirement of 15.70(c) has two components; the corporation must "be a party" to the merger; and the merger must be a "statutory" one. Although we conclude that USX was a party to the "Agreement," we find that USX was not a party to the merger. In fact, at the time of the 1986 transaction, USX did not merge with any corporation. This conclusion is based on a number of undisputed facts. First, the certificate of merger filed under the Delaware statute named only XCO and TXO as the "constituent corporations" to the merger. Second, USX did not file a single document under Illinois law indicating that it was a party to a merger as required under either section 13.35 or 14.25 of the Act, set out above. 805 ILCS 5/13.35, 14.25 (West 2000). Third, the witnesses for USX, who testified that USX was a party to the merger, provided no real bases for their opinions. Finally, the more persuasive testimony, which came from John Cobb, established that XCO and TXO, and not USX, were the only parties that actually merged in 1986. For these reasons, we conclude that USX was not a party to the merger under section 15.70(c) of the Act. Thus, this requirement of the statute has not been met.

We also conclude that the 1986 transaction was not a "statutory merger" as contemplated by section 15.70(c) of the Act. Although we are not reviewing the trial court's decision but rather the Secretary's, we agree with the trial court when it said, "there is a real and substantial difference between a statutory merger, which leaves one survivor and a combination which leaves two or more." The trial court noted that the type of merger to which the Secretary "has applied the aggregation rule, i.e., a horizontal merger," is one where "a single corporation survives." Importantly, the combination here resulted in two of the three corporations involved in the transaction remaining as they were before the transaction; one of them, however, TXO, became a wholly owned subsidiary of USX.

After reviewing the relevant sections of the Act and reading them together, as we are required to do, they indicate that the statutory merger described under 15.70(c) is a merger where only one corporation survives. Specifically, section 14.25(a), which requires the filing of a report following the merger or cancellation of shares/reduction in paid-in capital, states, in relevant part:

"Each domestic corporation and each foreign corporation authorized to transact business in this State that is a party to a statutory merger and is *the surviving corporation* [shall file a report setting forth several enumerated requirements.]" (Emphasis added.) 805 ILCS 5/14.25(a) (West 2000).

Section 11.05(a), which concerns the procedure for merger or consolidation, states, in relevant part:

"Any 2 or more corporations may merge *** in the following manner:

The board of directors of each corporation shall *** approve a plan of merger setting forth:

(a) The names of the corporations proposing to merge or consolidate, and the name of the corporation into which they propose to merge, which is hereinafter designated as *the surviving corporation* or to consolidate, which is hereinafter designated as the new corporation." (Emphasis added.) 805 ILCS 5/11.05(a) (West 2000).

Section 11.50(a)(1), which concerns the effect of merger, consolidation or exchange, states, in relevant part:

"The several corporations parties to the plan of merger or consolidation *shall be a single corporation, which, in the case of a merger, is that corporation designated in the plan of merger as the surviving corporation,* and, in the case of a consolidation, is the new corporation provided for in the plan of consolidation." (Emphasis added.) 805 ILCS 5/11.50(a)(1) (West 2000).

As we noted above, statutes "should be construed as a whole, with each section read in conjunction with every other section." *Forest*

*Preserve District of Du Page County*, 323 Ill. App. 3d at 692. Although there can be several corporations that could be parties to a plan of merger, it is clear that the surviving corporation "shall be a single corporation" under the language of the Act. Moreover, the legislature's repeated use of the term "statutory merger" with the singular phrase "the surviving corporation" indicates that the type of merger provided for is one where there is only one surviving corporation. Thus, the above-mentioned statutory sections of the Act, when read together, demonstrate the statutory merger that the legislature intended under section 15.70(c) is a merger that results in a single surviving corporation.

■ The legislature's consistent use of the term "statutory merger" with the singular phrase "the surviving corporation" also indicates that a "horizontal" merger involving one surviving corporation is the type of merger envisioned under section 15.70(c). While the term "statutory merger" is not defined in the Act, we conclude it refers to horizontal mergers and that the USX-TXO combination does not come within the intended meaning of the statute.

Further, even if we were to conclude that USX was a party to the business transaction at issue and the transaction was a statutory merger, we would still find that USX was not "the surviving corporation" under section 15.70(c) of the Act in order to qualify for the application of the aggregation rule.

As we pointed out above, under the Agreement, section 1.1(a) of the amended plan of merger provides that TXO "shall be the surviving corporation," and section 1.1 (b) stated that the surviving corporation "shall be named" TXO. There was no other surviving corporation identified in the Agreement. We find it significant that the parties to the Agreement, including USX, expressly stated that TXO would be the "surviving corporation" to the merger. In addition, only TXO was identified as the "surviving corporation" in the certificate of merger.

The real issue in this case is not whether reverse triangular mergers are permissible business combinations under Illinois or Delaware law; it is whether a parent that acquires a subsidiary as a result of a reverse triangular merger is entitled to the tax benefits of section 15.70(c). We hold that it is not.

Although never discussed extensively by the parties, we find that section 11.50(a) of the Act, when read together with section 15.70(c), is conclusive on this point. Section 11.50(a) addresses the "effect of merger, consolidation or exchange" upon the various parties to the merger, and states in pertinent part:

"When such [a] merger *** has been effected:

(1) The several corporations parties to the plan of merger or

consolidation shall be a single corporation, which, in the case of a merger, is that corporation designated in the plan of merger as the surviving corporation \*\*\*.

(2) The separate existence of all corporations parties to the plan of merger or consolidation, except the surviving or new corporation, shall cease.

(3) Such surviving or new corporation has all the rights, privileges, immunities, and powers and is subject to all the duties and liabilities of a corporation organized under this Act.

(4) Such surviving corporation shall \*\*\* possess all the rights, privileges, immunities, and franchises \*\*\* of each of the merging \*\*\* corporations \*\*\*.

(5) Such surviving or new corporation shall thenceforth be responsible and liable for all the liabilities and obligations of each of the corporations so merged \*\*\*; and any claim existing or action or proceeding pending by or against any of such corporations may be prosecuted to judgment as if such merger or consolidation had not taken place, or such surviving or new corporation may be substituted in its place." 805 ILCS 5/11.50(a)(1) through (a)(5) (West 2000).

■ Sections 11.50(a)(1) and (a)(2) clearly indicate that the legislature intended that a single surviving corporation remain after a statutory merger. In fact, under section 11.50(a)(2), all corporations that are parties to the plan of merger "except the surviving" corporation shall cease to exist. 805 ILCS 5/11.50(a)(2) (West 2000). Sections 11.50(a)(3), (a)(4), and (a)(5) indicate that the surviving corporation is subject not only to all the rights, privileges, and immunities of the merging corporation, but to all the liabilities and obligations of each of the merging corporations.

Although USX argues that it was a party to the merger, that the merger at issue was a "statutory" one under Illinois law, and that it was also a surviving corporation, it cannot seriously argue that it actually merged with TXO in 1986 under section 11.50(a). First, USX's existence never ceased. More important, it cannot and certainly will not claim that it assumed any of the liabilities of TXO in 1986, since it did not. To the contrary, at least two of USX's witnesses testified that it did not want to assume those liabilities for sound business reasons.

For example, Murphy's testimony made clear that USX did not merge horizontally with TXO in 1986 because it did not want the various loan covenants attached to TXO to apply to USX.

Another USX witness, Bigler, testified that triangular mergers were advantageous because:

"[T]his [form of combination] allows you to merge with somebody but to leave the [target] corporation intact in the sense that if they

> have licenses, you don't have to transfer them. If they have covenants and agreements with their parties that provide for consent in certain circumstances, you may not have to get them. So there are a number of business reasons why parties structure it that way.
>
> The other reason is they may not want their shareholders to be subject directly to whatever the liabilities are of the business they are acquiring. They may want to keep them in a separate legal entity and keep that in one place.
>
> So there is a variety of business reasons why people could choose to structure a merger as a triangular merger as opposed to a direct merger."

Further, we find that USX's witnesses provided little, if any, bases for their conclusions that USX was a surviving corporation to the merger in this case. We note that Bigler, USX's primary expert on Delaware law, did not rely on any authority in support of his conclusion that USX was a party to a statutory merger and that it was the surviving corporation of the combination under section 251 of the Delaware Corporation Law. In fact, Bigler admitted that there was no case law that decided the issue as to whether USX was a party to or a survivor of the merger under Delaware law.

In his direct testimony, Bigler said that there were two surviving entities in a reverse triangular merger. He also stated that USX was not a constituent or merging corporation because constituent corporations are the companies that actually merge. He identified XCO and TXO as the constituent corporations involved in the merger. While USX was not a constituent or merging corporation, he said that USX was a party to the merger because it was another "party" under section 251 that was not actually one of the merging corporations.

Bigler also concluded that USX was a survivor to the merger and that case law describing reverse triangular mergers generally discussed two survivors, but he did not cite any authority in support of this position. Later, Bigler said that, while there was no case law on the issue, it was the opinion of his firm that a Delaware court would determine that USX was a surviving corporation under these facts.

Bigler also concluded that the Agreement "provided that USX would be a surviving corporation, and that USX's existence would not be terminated as a result of the merger." On cross-examination, however, he admitted that the Agreement and the certificate of merger named TXO as the surviving corporation. He also admitted that USX was "not a merging party" relative to the 1986 merger between TXO and XCO. He further conceded that there was not a "legal" merger between USX and TXO in 1986 and that there was no document in

the case referring to USX as the surviving corporation. Finally, he agreed that the ultimate issue in the case was one of Illinois franchise tax law.

We note that, "[g]enerally[,] an expert may base an opinion upon specialized knowledge, including facts, data, or opinions contained in a learned treatise recognized as reliable authority." *Piano v. Davison*, 157 Ill. App. 3d 649, 510 N.E.2d 1066 (1987). Bigler's testimony was unsupported by any precedent, factual support, or the types of information relied upon by experts. He cited no facts, data, or opinions contained in a learned treatise recognized as reliable authority.

There were other flaws in his testimony. Bigler said that the Agreement provided that USX would be a surviving corporation and that USX's existence would not be terminated as a result of the merger. At least part of this statement is untrue. While the Agreement, article III, section 3.1, validated the existence of USX after the merger, the Agreement does not in any way identify USX as a surviving corporation. To the contrary, the only surviving corporation identified in the Agreement was TXO.

James Murphy, USX's in-house counsel, agreed in his testimony that USX did not merge with XCO or TXO in 1986. He also stated that USX was not listed as a party in the certificate of merger between XCO and TXO. However, he said that USX was a survivor in the reverse triangular merger between XCO and TXO. Murphy also said that he did not recall any legal document in the entire transaction that referred to USX as the surviving corporation.

Gene Peterson, an Illinois corporate attorney, testified that USX and TXO did not actually merge, though he did say that USX and TXO were surviving corporations because the merger at issue was a three-party merger. He, like Bigler, provided no authority for his opinions.

Also, on cross-examination, the following colloquy occurred between counsel for the Secretary and USX witness Gene Petersen:

"Q. Under the 1986 transaction under the statutory merger involved in the 1986 transaction, which of these three corporations was the surviving corporation?

A. Well, I think there was more than one surviving corporation.

Q. Wouldn't you agree, though, that the statute is written in the singular, no[t] the plural?

A. I think there is reason for that.

Q. Well, we will get into your reasons later; but would you agree that that is the way the statute is written in the singular?

A. Yes.

Q. As the statute is written in the singular, which of the three corporations here is the surviving corporation to a statutory merger?

A. Again, TXO was a surviving corporation. USX was a surviving corporation. This was a three-party merger; and when you have a three-party merger with two parties merging and as constituent corporations, you have two surviving corporations; and you have to try to construe the statute to fit that situation."

Later on redirect, Petersen stated:

"Illinois law has not always allowed stocks of the parent corporation to be used in the merger of two other corporations. Now it does.

It is my view that the phrase 'the surviving corporation' was simply a part of the statute at a time when there could be only one surviving corporation."

Petersen's statements do not comport with general principles of statutory construction and section 15.70(c) should not be construed "to fit" the situation of a three-party merger. As we noted above, one of the primary rules of statutory construction is to ascertain the intent of the legislature, and the best evidence of legislative intent is the language employed in the statute itself, which must be given its plain and ordinary meaning. *Forest Preserve District of Du Page County*, 323 Ill. App. 3d at 692. Further, a court is not permitted to ignore the plain meaning of the statute by reading into it conditions that the legislature did not express. *Forest Preserve District of Du Page County*, 323 Ill. App. 3d at 692. In our view, the exception in section 15.70(c) contemplates horizontal mergers which yield one "surviving corporation" as opposed to combinations like the one effected by USX in 1986. Had the legislature intended to extend the language of section 15.70(c) to include mergers that produced more than one surviving corporation, it could have done so. *Cione v. Chicago Transit Authority*, 322 Ill. App. 3d 95, 99, 748 N.E.2d 722 (2001).

Unlike the witnesses presented by USX, the Secretary's witness John Cobb provided facts for his opinion. He testified that USX did not merge with TXO in the 1986 transaction. According to Cobb, the 1986 merger was a statutory merger, but the parties were TXO and XCO. In Cobb's opinion, USX was not a survivor to the merger because the statute "[did] not provide for USX to be a survivor." Cobb opined that TXO was the only surviving corporation.

Cobb also said that, if USX had merged with TXO in 1986, a report following a merger would have been filed under section 14.25 of the Act. Cobb said that he was never shown a section 14.25 report following a merger, which would have indicated a merger between USX and

TXO. He also testified that, if USX had been the survivor of the 1986 merger with TXO, section 13.35 of the Act would have required articles of merger to be filed with the Illinois Secretary of State. Cobb stated that he had not seen any certificate of merger between USX and TXO but did see a certificate of merger between XCO and TXO.

Cobb's opinion that USX was not the surviving corporation in the 1986 merger between XCO and TXO was supported by the certificate of merger, which named only TXO as the surviving corporation, and the Agreement, which stated in section 1.1(b) that the surviving corporation "shall be named" TXO.

Dale Reynolds testified that no articles of merger were ever filed with the Secretary evidencing a 1986 merger between USX and TXO. Reynolds also stated that USX never filed a section 14.25 report following merger for a 1986 merger with TXO. James Murphy, USX's own counsel, admitted that he did not recall any legal document in the entire transaction that referred to USX as the surviving corporation.

The hearing officer concluded that the Act did not contemplate the existence of more than one corporation as the survivor to a combination. He further found that reading the Act as a whole led to the conclusion that reverse triangular mergers were excluded from the exception provided in section 15.70 of the Act. We are required to afford some deference to the agency's expertise and we must accept the agency's findings unless we are firmly convinced the agency made a mistake. *Randolph Street Gallery v. Zehnder*, 315 Ill. App. 3d 1060, 1064. Because we have found support for the Secretary's decision under several sections of the Act, particularly section 11.50(a), we are not firmly convinced that the agency made a mistake when it found that USX was not "the surviving corporation" under section 15.70(c).

Further, while we need not address defendant's argument concerning whether the aggregation rule was codified in section 14.25 of the Act, we find it significant that USX chose to file a report of issuance of shares and increases in paid-in capital under section 14.20 of the Act instead of under section 14.25. Section 14.20 expressly applies to the reporting of issuance of shares and increases in paid-in capital, whereas section 14.25 of the Act concerns a report following a merger or cancellation of shares/reduction in paid-in capital. 805 ILCS 5/14.20, 14.25 (West 2000). USX asserts that because section 14.20(a) applies to "any share not previously reported to the Secretary of State as having been issued," reporting the consideration received for shares does not differ in any material respect from the reporting requirements in section 14.25. 805 ILCS 5/14.20(a) (West 2000). According to USX, both sections 14.20 and 14.25 incorporate or require reference to section 180(j) of the Act to determine the amount of paid-in capital following a merger.

Despite the claims by USX, we note the significance of USX's decision to file under section 14.20 as opposed to section 14.25, which directly concerns a report following a merger. If USX truly considered itself a surviving corporation to a statutory merger, it should have filed a report under section 14.25, which is the applicable section for filing a report following a merger. Further, USX never filed a copy of any articles of merger as required for foreign corporations surviving a merger under section 13.35 of the Act.

The hearing officer noted that a review of the Act as a whole led to the conclusion that reverse triangular mergers were excluded from the exception (or benefit of the aggregation rule) provided for in section 15.70 of the Act. Specifically, the hearing officer stated:

"Support for this conclusion is found in the Official Comments of the Advisory Committee. The committee describes a reverse triangular merger in its comment on § 11.20 and specifically refers to the target corporation as the survivor ***.

I submit that there is a rational and reasonable legislative purpose for this exclusion. That is the fact that a reverse triangular merger offers several economic/monetary advantages (over the more conventional horizontal merger) to the parties. Some of those were discussed by Mr. Murphy during his cross-examination. There are also some federal income tax advantages to a reverse triangular merger, which are outlined in the prospectus."

James Murphy testified that the reason why a horizontal merger was not used in the instant case was because TXO had "a number of financing documents that contained various [loan] covenants and required certain approvals that would have presented problems." Thus, he explained that it was necessary TXO remain a separate corporation so that the loan covenants would not apply to USX. He further stated that there was also a desire to retain the TXO name and reputation. Murphy also explained that there was a desire to avoid the need to obtain third-party consent with regard to certain leases.

In its reply brief, USX admitted that the reason it chose a triangular merger verses a horizontal merger was that it was "administratively more convenient than a horizontal merger, given that certain loans and contracts required the approval of the other parties if [USX] was a constituent party to a horizontal merger." In its opening brief, however, USX stated, "although the form of the combination between plaintiff and TXO may have differed from a horizontal merger, the economic reality of the transaction was the same." This assertion is somewhat disingenuous given USX's admission and Murphy's statement that it was administratively more

convenient to merge via a reverse triangular merger and Murphy explained that USX's desire to retain the name and reputation of TXO in the state where it operated, had a certain economic advantage.

It is obvious that USX's use of a reverse triangular merger had certain economic advantages. Otherwise, there would have been no incentive for USX to use that form of combination.

With regard to the other companies referred to by USX, we agree with the Secretary that the filings of those companies do not support USX's position that the pooling-of-interest method applied to the merger transaction at issue. As pointed out by the Secretary, Conlee's testimony suggests that the other corporations referred to either misreported or failed to correctly report a paid-in capital increase. The Secretary has dealt with these situations by notifying the company that a statement of correction had to be filed. Some companies then filed statements of correction and the ones who did not respond had "their certificate of authority revoked." This testimony suggests that the Secretary was taking action with regard to incorrect filings made by these companies. As a result, we are not persuaded by USX's argument that the original filings of these companies support the application of the pooling-of-interest method of accounting to triangular mergers under section 15.70(c).

The decision of the Secretary is affirmed.

Affirmed.

CAHILL and BURKE, JJ., concur.